WO                                                                                                    SH

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Christopher James Henson,

Plaintiff,

v.

Corizon Health LLC, et al.,

Defendants.

No.   CV 19-04396-PHX-MTL (DMF)

**ORDER**

Plaintiff Christopher James Henson, who is currently confined in Arizona State Prison Complex (ASPC)-Florence, East Unit, brought this civil rights action pursuant to 42 U.S.C. § 1983.  (Doc. 116.)  Defendants move for summary judgment (Docs. 152, 161, 164).  Although Plaintiff was informed of his right and obligation to respond to Defendants' Motions for Summary Judgment,[1] and was granted several deadline extensions (Docs. 173, 178, 203, 210, 213), Plaintiff failed to respond, and the time to do so has expired.[2]

. . .

. . .

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response.  (Docs. 160, 167, 168.)

[2] Because Plaintiff failed to file a response or controverting statement of facts, the Court will consider Defendants' facts undisputed unless they are clearly controverted by Plaintiff's first-hand allegations in the verified Complaint or other evidence on the record. Where the nonmovant is a pro se litigant, the Court must consider as evidence in opposition to summary judgment all the nonmovant's contentions set forth in a verified complaint or motion.  *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

## I.     Background

On screening of Plaintiff's Second Amended Complaint (Doc. 116) pursuant to 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated constitutional claims against Defendants Arizona Department of Corrections (ADC) Director David Shinn, Corizon Health, Centurion of Arizona, Nurse Practitioner Dorothy Igwe, Contracting Monitoring Bureau Director David Robertson, Supervisor Vanessa Headstream, Dr. Rodney Stewart, Medical Director Thomas Lutz, Facility Health Administrators Adam Perkins and Trina Randall, Nursing Supervisors Elizabeth Pontious and Phyllis Raney, and ADC Office of Publication Review employees Tray Williams and Diane Miller and ordered them to respond to the respective claims against them.  (Docs. 70, 117.)  The Court subsequently dismissed Defendants Williams and Miller pursuant to Federal Rule of Civil Procedure 12(c).  (Doc. 162.)  The Court also dismissed Defendant Lutz for failure to timely serve. (Doc. 179.)

In Count 1 of the Second Amended Complaint, Plaintiff alleges that he was diagnosed with Hepatitis B and C while incarcerated in the ADC and that "ADC, Corizon, and Centurion have a policy, practice, and custom of monitoring prisoners with HCV [Hepatitis C] instead of providing treatment or cures."  Plaintiff alleges that they have failed to monitor or treat his Hepatitis B and C "due to financial incentive."  (Doc. 116 at 6.)

Plaintiff claims that while confined in ASPC-Eyman in late 2017, he began noticing that he was easily fatigued and had a loss of appetite, aching joints, pain in his lower back around his kidneys, and pain in stomach and lower abdomen.  Plaintiff submitted a health needs request (HNR) form and was seen by a nurse practitioner who ordered blood laboratory tests.  The December 2017 blood test showed Plaintiff had "elevated AST & ALT scores."  Plaintiff claims elevated AST & ALT levels are present in individuals who have chronic Hepatitis C.  In February, March, and September 2018, Plaintiff's blood tests also showed abnormally elevated AST & ALT levels.   Plaintiff claims the nurse practitioner ordered a "hepatitis panel" in May 2018 that confirmed that Plaintiff had been recently infected with Hepatitis B.  He contends his Hepatitis B is dormant but has the

potential to "re-activate or flare-up."   Plaintiff alleges that having a Hepatitis B/C coinfection can potentially put him at risk for liver disease progression, decompensated liver disease, and "HCC."[3]   He claims there are medications available that can cure Hepatitis B and C.  (*Id.* at 7.)

Plaintiff alleges he was transferred to ASPC-Florence in October 2018. He submitted an HNR form on December 3, 2018, requesting Hepatitis B and C treatment, and was seen by a nurse that day.  Plaintiff requested information regarding his viral load, the genotype for his Hepatitis C, and what forms of Hepatitis B he had been exposed to. The nurse did not know and referred Plaintiff to the providers' line.  On December 15, 2018, Plaintiff had a teleconference with a certified family nurse practitioner regarding his chronic care. Plaintiff requested information regarding his viral load, enzyme levels, and Hepatitis C genotype. The nurse practitioner indicated he did not know this information because the prior providers had not ordered those types of tests, but the nurse practitioner ordered a "full blood lab that included viral load, log-10, fibrosis screening and inflammation screening" and explained that Defendant Corizon's Hepatitis committee would have to approve and order the genotype test.  (*Id.* at 7–8.)

Plaintiff claims he was called to the medical department on December 17, 2018, to see Defendant Igwe for chronic care. He states he had seen the nurse practitioner two days earlier for chronic care and this demonstrates a lack of "centralized coordination."  Plaintiff asserts Defendant Igwe would not address Plaintiff's medical issues or concerns, would not allow Plaintiff to take notes, and, when Plaintiff requested a liver biopsy and Hepatitis B and C treatment or cures, Igwe said Plaintiff did not "get to dictate treatment or who provides the treatment."  Plaintiff contends the results of the tests ordered by the nurse practitioner showed Plaintiff had abnormally high AST, ALT, viral load, and "Log-10"; minimal fibrosis,[4] and significant liver inflammation.  (*Id.* at 8–9.)

---

[3] Presumably, Plaintiff is referring to hepatocellular carcinoma.

[4] Plaintiff alleges fibrosis is the "first stages of scarring of the liver, which is irrevers[i]ble perm[a]nent long-term damage to [his] liver."  (Doc. 116 at 9.)

1    Plaintiff asserts that he submitted an informal complaint on December 28, 2018,
2    regarding Hepatitis B and C treatment, but ADC and Defendant Corizon chose not to take
3    corrective action. He alleges he submitted a grievance on January 22, 2019, but Defendant
4    Perkins stated that Plaintiff's "current APRI score [wa]s 0.871[,] which did not warrant
5    treatment." Plaintiff claims the APRI method is "unreliable for testing conclusions" and
6    more than half of individuals with fibrosis or cirrhosis will not have APRI scores of 2.0 or
7    higher. He contends other methods, such as liver biopsies "reliably determine if a person
8    is suffering from fibrosis or cirrhosis and what stage of advancement it is at." (*Id.* at 10.)

9    Plaintiff claims he was called to the medical department on January 29, 2019, but
10   Defendant Igwe refused to see Plaintiff because Plaintiff had allegedly cursed at her.
11   Plaintiff claims he submitted another HNR on February 11, 2019, seeking a liver biopsy
12   and Hepatitis B/C treatment and indicating, at the top of the form, that he was "begging for
13   [Defendant Igwe's] help." (*Id.* at 9.)

14   Plaintiff claims he saw Defendant Igwe on February 18, 2019, and the genotype test
15   was approved. Plaintiff claims the test was conducted three days later and showed that
16   Plaintiff had "genotype 3." Plaintiff alleges that available data suggests that "fibrosis
17   progression occurs most rapidly in patients with genotype 3" and that it is recommended
18   that almost all individuals with chronic Hepatitis C receive direct acting antiviral drugs.
19   (*Id.*)

20   Plaintiff alleges that on May 12, 2019, he submitted an HNR to Defendants Igwe
21   and Stewart requesting Hepatitis B and C treatment. In response, Plaintiff was told that
22   the provider had explained the Hepatitis C treatment and criteria and that he could submit
23   an inmate letter. (*Id.*)

24   Plaintiff alleges that on July 1, 2019 and July 29, 2019, he submitted HNRs to
25   Defendant Centurion requesting Hepatitis C treatment. He had labs taken on August 13,
26   2019, which showed elevated AST and ALT levels. Plaintiff claims Defendant Igwe told
27   him "that monitoring is sufficient treatment." (*Id.* at 12.)

28

Plaintiff claims that at some unspecified time, he told Defendant Igwe he was experiencing "unbearable" stomach pain and pain in his body.  He had previously been prescribed Excedrin, but Defendant Igwe "constantly removed/discontinued" the prescription and has refused to provide [Plaintiff] with adequate pain management medication.  In February, April, June, and July 2019, Plaintiff requested pain management medication from Defendant Igwe, and Defendant Igwe prescribed alpha lipoic acid, even though she knew that does not relieve Plaintiff's pain.  Defendant Igwe told Plaintiff that Defendants Stewart, Robertson, Corizon, and Centurion "ordered all employees not [to] give pain medications that help."  (*Id.* at 11.)

Plaintiff alleges that Defendant Corizon is required by its "own contractual agreement to the Performance Measure Stipulation[]s set forth in *Parsons v. Ryan*" to develop treatment plans and document them in the medical record within 30 days of identifying that an inmate has a chronic disease.  Plaintiff claims that "monitoring" Hepatitis C is not "treatment" and that ADC and Defendant Corizon have chosen to "cherrypick [a] select few to receive [direct acting antivirals] . . . with fina[n]cial incentive/cost/profit in mind."  Plaintiff claims Defendants completely disregarded his medical concerns, took no action at all, and were deliberately indifferent.  (*Id.* at 10.)

Plaintiff alleges he is a qualified individual under the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA) and that Defendants Corizon and Centurion have "denied [him] the benefit of services by being subjected to discrimination."[5]  Plaintiff

---

[5] Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  To the extent Plaintiff intends to assert an ADA claim, his claim fails because claims under the ADA cannot be based on medical treatment decisions.  *Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005).  Moreover, Plaintiff's daily life activities do not count as services, programs, or activities under the ADA.  Here, Plaintiff claims that he received inadequate treatment for his disability rather than discrimination because of his disability.  Although the ADA affords disabled persons legal rights regarding access to programs and activities enjoyed by all, it does not provide them with a general federal cause of action for challenging the medical treatment of their underlying disabilities.  *Burger*, 418 F.3d at 883 (holding that ADA claims cannot be based on medical treatment decisions); *Schiavo ex. Rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005) (finding that the ADA "was never intended to apply to decisions involving . . . medical treatment"); *Bryant v. Madigan,* 84 F.3d 246, 249 (7th Cir.

1   asserts that his Hepatitis C "substantially limits one or more of [his] major life activities"

2   including eating, bending over, and sleeping. (*Id.* at 13.)

3       Plaintiff alleges that as a result of these events, he has suffered liver scarring,

4   fatigue, dark urine, clay-colored stool, abdominal pain, rectal bleeding, loss of appetite,

5   nausea, and joint pain. (*Id.* at 6, 14.)

6       In Count 2, Plaintiff alleges that after noticing a cyst on the right side of his scrotum

7   in December 2017, he submitted an HNR and was seen by the nurse practitioner in

8   December 2017 or January 2018.   The nurse practitioner examined the cyst and

9   recommended an ultrasound, which was approved by Utilization Management.  He claims

10  he went to the ultrasound in February 2018 so a plan of treatment could be established, but

11  no further diagnostic testing has been "recommended/requested via [the Utilization

12  Management Team] to determine the cause of the [cyst] and whether it could be life

13  threatening with regard[] to testicular cancer." (*Id.* at 15.)

14      Plaintiff alleges he submitted HNRs to Defendant Igwe in December 2018 and

15  February and March 2019 requesting that the cyst be removed and biopsied to test for

16  cancer and indicating that the cyst continued to increase in size and continued to cause

17  discomfort.  He claims his requests were made "to no avail." Plaintiff contends he was

18  called into the medical department, but he is "met with stonewalling" when he seeks "some

19  action" be taken regarding his cyst.  He alleges that on February 20, 2019, Defendant Igwe

20  refused to request a biopsy, laughed at Plaintiff, and told him that Defendant "Corizon will

21  not pay for that[;] they already performed an ultrasound, and you[']r[e] a prisoner; what

22  more do you want[?]" (*Id.* at 16, 17.)

23

24  _____

25  1996) (concluding that the ADA "would not be violated by a prison's simply failing to
    attend to the medical needs of its disabled prisoners" and that the statute "does not create

26  a remedy for medical malpractice").  The failure to provide adequate medical treatment
    "does not fall within the provisions of the ADA[.]"  *Brown v. Baca*, No. CV 07-819-CAS

27  (DTB), 2010 WL 316475, at *7 (C.D. Cal. Jan. 18, 2010).  Accordingly, to the extent
    Plaintiff intended to bring an ADA claim in Count 1, this claim is dismissed.  *See* 28 U.S.C.

28  § 1915(e)(2)(B) (under the Prisoner Litigation Reform Act (PLRA), the Court is required
    to dismiss an in forma pauperis case (or claim) at any time if the court concludes that the
    plaintiff has failed to state a claim).

Plaintiff alleges he sent multiple inmate letters to Defendants Headstream and Robertson and former ADC Director Ryan in February and April 2019.  He claims he wrote to them in February and April 2019 regarding his Hepatitis B and C and the cyst on his scrotum.  Plaintiff alleges Defendant Robertson did not respond.  He claims Defendant Headstream provided a "form" response that "countless other prisoners have received."  He alleges she responded that "Responsibility and accountability for inmate health care is demanded, now, as in the past," but this was "no more than her window dressing for ADC & Corizon."  Plaintiff also asserts Defendant Headstream responded on Ryan's behalf, again providing a form response and not taking any action regarding a biopsy or treatment. (*Id.*)

Plaintiff asserts Defendants Robertson and Headstream are aware "that the constitutional violation [and] gross lack of adequate health/medical care has been ongoing."  Plaintiff claims Defendants Robertson and Headstream, as supervisors, have the authority to remedy constitutional violations.  (*Id.* at 17.)

In addition, Plaintiff claims he submitted an inmate informal complaint to Defendant Perkins on March 29, 2019, but Defendant Perkins did not respond.  Plaintiff asserts that in denying him a biopsy, Defendants were acting in concert "due to a policy, practice, [and] custom of ADC, Corizon, and Centurion that den[ies] prisoners in state custody adequate medical care."  (*Id.* at 17, 18.)

Plaintiff alleges that "[o]n many occasions[,]" he told Defendant Igwe "that two cysts in [his] scrotum are causing [him] pain that is unbearable."  On August 13, 2019, Plaintiff had labs taken which showed "above high normal levels" of lymphocyte, ALT, AST, GT7, GGT, and Gamma; Plaintiff's neutrophils were below normal.  Plaintiff received no explanation for these lab results.  Plaintiff claims Defendant Igwe told him that she could not do anything except order an ultrasound, pursuant to instructions she received from Defendant Stewart.  (*Id.*)

In Count 3, Plaintiff alleges Defendants Corizon and Centurion, pursuant to their contracts with ADC, agreed that ADC's policies would supersede their own policies.  He

1  claims ADC's health care directives require each facility to provide "planned care in a
2  comprehensive continuous fashion" and require "care to be 'organized and consistent
3  across facility lines.'"   Plaintiff contends, however, that Corizon and Centurion have
4  ignored this policy and have deliberately chosen a policy of not centrally coordinating
5  medical services for prisoners.  He alleges he has received care from multiple providers,
6  but, "under [Defendant] Corizon['s] policy choices, no one person was responsible for
7  coordinating his overall care."  Plaintiff asserts that he has "yet to arrive at a unit where the
8  health care provider has [his] medical file in front of [the provider]" to review "pas[t]
9  information from previous health care providers" and to "understand the clear scope of the
10  individual currently before [the provider]."  (*Id.* at 20–21.)

11      Plaintiff also alleges that all Defendants have "impeded and delayed [his] ability to
12  have meaningful access to the courts."   Plaintiff claims former ADC Director Ryan
13  "changed ADC policy to give Corizon and Centurion the exclusive authority over the
14  medical grievance process" and that they have removed the ability to appeal which has
15  "rendere[ed] the grievance process unavailable." (*Id.* at 23.)

16      In Count 4, Plaintiff alleges that the "ADC has no law libraries and the paralegal is
17  not allowed to assist inmates, except to p[er]form the function of reviewing documents."
18  Plaintiff claims that he ordered a book titled, "An Inexplicable Deformity," "which
19  discusses ADC and Corizon and cases that may be helpful."  (*Id.*)  Plaintiff claims that on
20  September 25, 2019, former Defendants Williams and Miller told him he could not have
21  the book pursuant to ADC policy because the book "discusses cases that names [ADC]
22  employee's [sic]."  (Doc. 116-1 at 2.)

23      In Count 5, Plaintiff alleges that his asthma and Hepatitis C put him at increased
24  risk of contracting the Covid-19 virus, and Defendant Shinn has failed in his duties as ADC
25  Director to implement proper cleaning and screening policies to protect Plaintiff and other
26  prisoners from the disease. (*Id.* at 4.)

27  . . .

28  . . .

## II.     Miscellaneous Motions

### A.     Defendants' Motion for Ruling

Defendants move for summary disposition of their Motion for Summary Judgment based on Plaintiff's failure to file a response pursuant to Local Rule of Civil Procedure 7.2(i), which provides that the Court may deem a party's failure to respond to a motion as consent to the granting of the motion.

In *Heinemann v. Satterberg*, the Ninth Circuit clarified that a local rule permitting a district court to treat the lack of a response as consent to granting a motion does not apply to summary judgment motions.  731 F.3d 914, 917 (9th Cir. 2013) (finding that Western District of Washington Local Rule 7(b)(2) conflicts with Federal Rule of Civil Procedure 56 and cannot provide a valid basis for granting a motion for summary judgment).[6]  If a summary judgment motion is unopposed, Rule 56 "authorizes the court to consider a fact as undisputed," but it does not permit the court to grant summary judgment by default.  *Id.* Indeed, under the summary judgment standard, if the moving party fails to meet its initial burden of production, the opposing party need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  The Court must therefore address Defendants' Motion for Summary Judgment on the merits, and it will deny Defendants' Motion for Summary Disposition.

### B.     Plaintiff's Motions to Disqualify Counsel

Plaintiff seeks to disqualify defense counsel based on District Judge Silver's observations about long-term compliance with the stipulation in *Parsons v. Ryan*, CV12-00601-PHX-ROS.  (*See* Doc. 215 at 1-2.)  Plaintiff also moves to consolidate the ruling on the pending Motion to Disqualify Counsel with the ruling on similar motions filed by other prisoner plaintiffs in unrelated actions that are pending before this Court.  (Doc. 217.)

---

[6] Western District of Washington Local Rule 7(b)(2) states that "[i]f a party fails to file papers in opposition to a motion, such a failure may be considered by the court as an admission that the motion has merit."  *Heinemann*, 731 F.3d at 916.

As an initial matter, Federal Rule of Civil Procedure 42 provides that when actions involving a common question of law or fact are pending before the Court, they may be consolidated. Here, the cases Plaintiff seeks to consolidate all deal with different factual matters, different plaintiffs, different defendants, and the cases are in different procedural postures. Thus, it would not promote the conservation of judicial resources to consolidate these cases at this time. *See* Fed. R. Civ. P. 42(a)(3) (consolidation of cases may be warranted "to avoid unnecessary cost or delay"). Nor would consolidation secure a speedy determination of the present action. *See* Fed. R. Civ. P. 1 (the procedural rules should be "administered to secure the just, speedy, and inexpensive determination of every action"). Accordingly, Plaintiff's request to consolidate rulings will be denied.

The Court will also deny Plaintiff's request to disqualify defense counsel. Federal courts apply state law when determining matters of disqualification and must follow the reasoned view of the state supreme court when it has spoken on an issue. *In re Cnty. of L.A.*, 223 F.2d 990, 995 (9th Cir. 2000). "This Court applies the Arizona ethical rules when evaluating motions to disqualify counsel." *Roosevelt Irrig. Dist. v. Salt River Project Agric. Improvement and Power Dist.*, 810 F.Supp.2d 929, 944 (D. Ariz. 2011). The Arizona Rules of Professional Conduct warn that "the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons." *Id.* (citing Pmbl. ¶ 20, Ariz. R. Prof'l Conduct). Pursuant to Arizona law, "[o]nly in extreme circumstances should a party to a lawsuit be allowed to interfere with the attorney-client relationship of his opponent." *Id.* (citing *Alexander v. Superior Ct.*, 685 P.2d 1309, 1313 (Ariz. 1984)). The party moving for disqualification has the burden of sufficiently showing why the Court should disqualify an attorney from representing its client. *Roosevelt*, 810 F.Supp.2d at 944-945.

As noted by Defendants, Judge Silver's observations regarding the *Parsons* case have no bearing on Plaintiff's claims in this case. Moreover, Plaintiff has not shown that "extreme circumstances" exist in this case that would warrant the Court interfering with

1    Defendants' attorney-client relationship.  Accordingly, the Motion to Disqualify Counsel
2    will be denied.

3    **III.    Summary Judgment Standard**

4           A court must grant summary judgment "if the movant shows that there is no genuine
5    dispute as to any material fact and the movant is entitled to judgment as a matter of law."
6    Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The
7    movant bears the initial responsibility of presenting the basis for its motion and identifying
8    those portions of the record, together with affidavits, if any, that it believes demonstrate
9    the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

10          If the movant fails to carry its initial burden of production, the nonmovant need not
11   produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099,
12   1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts
13   to the nonmovant to demonstrate the existence of a factual dispute and that the fact in
14   contention is material, i.e., a fact that might affect the outcome of the suit under the
15   governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable
16   jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.
17   242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th
18   Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its
19   favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,
20   it must "come forward with specific facts showing that there is a genuine issue for trial."
21   *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal
22   citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

23          At summary judgment, the judge's function is not to weigh the evidence and
24   determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,
25   477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw
26   all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited
27   materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).
28   . . .

1    **IV.    Medical Claims**

2         **A.    Legal Standard**

3         To support a § 1983 medical claim, a plaintiff must show (1) a "serious medical

4    need" by demonstrating that failure to treat the condition could result in further significant

5    injury or the unnecessary and wanton infliction of pain and (2) the defendant's response

6    was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

7         "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d

8    1051, 1060 (9th Cir. 2004). To act with deliberate indifference, a prison official must both

9    know of and disregard an excessive risk to inmate health; "the official must both be aware

10   of facts from which the inference could be drawn that a substantial risk of serious harm

11   exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

12   Deliberate indifference in the medical context may be shown by a purposeful act or failure

13   to respond to a prisoner's pain or possible medical need and harm caused by the

14   indifference. *Jett*, 439 F.3d at 1096. Deliberate indifference may also be shown when a

15   prison official intentionally denies, delays, or interferes with medical treatment or by the

16   way prison doctors respond to the prisoner's medical needs. *Estelle v. Gamble*, 429 U.S.

17   97, 104-05 (1976); *Jett*, 439 F.3d at 1096.

18        Deliberate indifference is a higher standard than negligence or lack of ordinary due

19   care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross

20   negligence will constitute deliberate indifference." *Clement v. Cal. Dep't of Corrs.*, 220 F.

21   Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458,

22   460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice"

23   do not support a claim under § 1983). "A difference of opinion does not amount to

24   deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d

25   240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to

26   state a claim against prison officials for deliberate indifference. *See Shapley v. Nev. Bd. of*

27   *State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be

28

1    substantial.  The action must rise to a level of "unnecessary and wanton infliction of pain."

2    *Estelle*, 429 U.S. at 105.

3         Moreover, to prove a claim under § 1983 against a private entity performing a

4    traditional public function, such as providing medical care to prisoners, a plaintiff must

5    satisfy the test articulated in *Monell v. Department of Social Services of City of New York*,

6    436 U.S. 658, 690-94 (1978), by presenting facts to support that his constitutional rights

7    were violated as a result of a policy, decision, or custom promulgated or endorsed by the

8    private entity.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138-39 (9th Cir. 2012).

9    In this case, Plaintiff must show: (1) that his constitutional rights were violated by an

10   employee or employees of Corizon and/or Centurion; (2) that Corizon and/or Centurion

11   has customs or policies that amount to deliberate indifference; and (3) that the policies or

12   customs were the moving force behind the violation of Plaintiff's constitutional rights in

13   the sense that Corizon and/or Corizon could have prevented the violation with an

14   appropriate policy.  *See Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1193-94 (9th Cir.

15   2002).

16        **B.    Relevant Facts**

17             **1.    ADC Hepatitis C Protocol**

18        According to a Report published by Gilead Science, the challenges facing prisons

19   in treating the inmate population infected with Hepatitis C include budgetary constraints,

20   the high cost of treatment, and the fact that incarcerated individuals are up to 13 times more

21   likely to have detectible levels of Hepatitis C in the blood than in the general population.

22   (Doc. 153 (Corizon Defs.' Statement of Facts) ¶ 85.)  Recognizing these challenges, the

23   Federal Bureau of Prisons' (BOP) Clinical Guidance manual for the Evaluation and

24   Management of Chronic Hepatitis C (HCV) Infection (adopted by ADC and Corizon

25   Health), contains a comprehensive framework for prioritizing prisoners for Hepatitis C

26   treatment so that those with the greatest need are identified and treated first.  (*Id.* ¶ 86.)

27        According to the BOP manual, progression from chronic Hepatitis C infection to

28   fibrosis and eventually cirrhosis may take years in some patients and decades in others –

or, in some cases, may not occur at all.  (*Id.* ¶ 87.)  Most complications from Hepatitis C infection occur in people with cirrhosis.  (*Id.* ¶ 88.)  Therefore, assessing for cirrhosis is important in prioritizing prisoners for Hepatitis C treatment.  (*Id.* ¶ 89.)

To that end, the APRI score is the "BOP-preferred method for non-invasive assessment of hepatic fibrosis and cirrhosis" and "APRI scores [greater than] 2.0 may be used to predict the presence of cirrhosis."  (*Id.* ¶ 90.)  The APRI score is calculated[7] using the results of two blood tests – the AST (aspartate aminotransferase) and the platelet count – and is considered a less expensive and less invasive means of assessing liver fibrosis than a liver biopsy.  (*Id.* ¶ 91.)

The Gilead Report similarly recognizes that the severity of liver disease in people with Hepatitis C can be estimated using formulas based on common laboratory tests.  Two common methods are the AST to platelet ratio (APRI) and the Fibrosis-4 Index.  (*Id.* ¶ 92.)

According to the BOP standards, prisoners with "advanced hepatic fibrosis," liver transplant recipients, and those with comorbid medical conditions are the highest priority (Priority Level One) for treatment.  (*Id.* ¶ 93.)  Advanced hepatic fibrosis is demonstrated through either: (1) an APRI score [greater than] 2; (2) "Metavir or Batts/Ludwig stage 3 or 4 on liver biopsy;" or (3) known or suspected cirrhosis.  (*Id.* ¶ 94.)  Liver transplant recipients, those with certain co-morbid medical conditions, immunosuppressed patients, and those who were already started on treatment when they were incarcerated also fall into the Priority Level One category.  (*Id.* ¶ 95.)

Next, patients in the "intermediate" priority category (Priority Level 2) have an APRI score greater than 1 and/or "stage 2 fibrosis" on a liver biopsy.  Those with certain comorbid conditions, including liver disease, diabetes and chronic kidney disease, also fall into the Priority Level 2 category.  (*Id.* ¶ 96.)

---

[7] The formula for calculating the APRI score is [(AST/AST ULN) x 100] / platelet count (10⁹/L ).  (Doc. 153 ¶ 91.)

Finally, those with an APRI score less than 1 are the lowest priority (Priority Level 3) for treatment.  Those with stage 0-1 fibrosis on a liver biopsy also fall into this category. (*Id.* ¶ 97.)

Because APRI scores are used to predict the presence of cirrhosis, the standards no longer require a liver biopsy.  (*Id.* ¶ 98.)

A CTP score can also be useful in determining the severity of cirrhosis.  It is utilized to distinguish between compensated and decompensated liver disease in patients with known or suspected cirrhosis.  The CTP score includes five parameters (encephalopathy, ascites, bilirubin, albumin, and international normalized ratio), with each given a score of 1, 2, or 3.  The sum of the five parameters is the CTP score.  A CTP score of 5 is considered Class A.  (*Id.* ¶ 99.)

If priority criteria for treatment are met, the Hepatitis C genotype can assist in determining the most appropriate direct-acting antiviral (DAA) regimen.  (*Id.* ¶ 100.)

The Gilead Report recognizes that other healthcare providers, such as Medicaid, use similar parameters to determine treatment eligibility, such as fibrosis severity and patient sobriety, in order to "manage cost and utilization of HCV therapy."  (*Id.* ¶ 101.)

In addition to the BOP manual, Corizon Health follows the ADC "Clinical Practice Guidelines for the Prevention and Treatment for Viral Hepatitis C."  The Clinical Practice Guidelines estimate that approximately 23% of ADC prisoners are infected with Hepatitis C.  (*Id.* ¶ 102.)  The Clinical Practice Guidelines memorialize the high, intermediate, and low Priority Levels contained within the BOP manual almost verbatim.  (*Id.* ¶ 103.)  The Clinical Practice Guidelines also state that prisoners with an APRI score of 0.7 or above and who have findings suggestive of advanced fibrosis (low albumin or platelets, elevated bilirubin or International Normalized Ration (INR)) will be prioritized for treatment.  (*Id.* ¶ 104.)

Additionally, since January 1, 2010, the Corizon Hepatitis C Committee has based its decision whether to treat individual Hepatitis C-infected prisoners on a number of

factors, including but not limited to, absence of risky behavior as evidenced by no disciplinary tickets for drug possession or tattoos for one year.  (*Id.* at 105.)

Dr. Craig Hutchinson is a consultant for Corizon Health, Inc. and is board-certified in internal medicine and infectious disease.  Dr. Hutchinson evaluates and treats patients with Hepatitis C.  (*Id.* ¶ 106.)

Elevated APRI may indicate a high level of liver fibrosis, a high level of liver inflammation, or a combination of the two.  To help identify those patients with high fibrosis (who are high priority for treatment), Dr. Hutchinson estimates adequacy of liver function through the Child-Turcotte-Pugh (CTP) Classification.  Similarly, the BOP also recommends utilizing the CTP Classification.  The Classification is based on five factors: encephalopathy, ascites, bilirubin, albumin, and international normalized ratio.  The first two of those are based on physical examination and/or imaging, and the latter three are lab tests.  Each factor is assigned a point value from one to three, so entirely normal findings generate a CTP score of five.  Additional points reflect impairment of liver function, with the worst possible score of 15.  (*Id.* ¶ 107.)

On December 20, 2018, Plaintiff had no evidence of encephalopathy, which is 1 point.  Plaintiff had no evidence of ascites, which is 1 point.  Plaintiff's bilirubin on December 20, 2018 was 0.4, which is 1 point.  Plaintiff's albumin on December 20, 2018 was 4.8, which is 1 point.  Plaintiff's INR on December 15, 2017 was 1.06, and on May 30, 2019, was 1.04, which also yield 1 point for INR.  Thus, Plaintiff's total was 5 points, which is the lowest score possible and is considered Class A.  Among patients with cirrhosis, which Plaintiff did not have, Class A reflects the best liver compensation.  (*Id.*)

For patients with elevated APRI and normal CTP score, Dr. Hutchinson frequently uses a blood test panel, such as the Fibrotest/Actitest, which gives independent fibrosis and inflammation scores that predict reasonably well what a liver biopsy would show.  Plaintiff had the Fibrotest/Actitest on December 20, 2018, and it predicted fibrosis stage 1-2 of 4, and significant inflammation.  However, significant inflammation is not an indication for priority of treatment.  (*Id.* ¶ 108.)

## 2. Plaintiff's Medical Treatment under ADC/Corizon

Plaintiff is a prisoner in the custody of the ADC. (Doc. 153 ¶ 1.) On February 15, 2017, Plaintiff was transferred from ASPC-Lewis to ASPC-Eyman with his medical records and active medication orders. (*Id.* ¶ 2.) On October 31, 2017, Plaintiff was transferred from ASPC-Eyman to ASPC-Winslow with his medical chart and his keep-on-person (KOP) medications. (*Id.* ¶ 3.) On November 2, 2017, Plaintiff was transferred from ASPC-Winslow back to ASPC-Eyman with his medical chart and KOP medications. (Doc. 154-1 at 9 (Corizon Defs.' Ex. 2).)

On November 3, 2017, Nurse Practitioner (NP) Betty Hahn ordered a diagnostic panel and prothrombin time/INR test, but Plaintiff refused them. (Doc. 153 ¶ 4.)

On November 28, 2017, Plaintiff was transferred back to ASPC-Winslow with his medications and chart. (*Id.* ¶ 5; *see* Doc. 154-1 at 18–23 (Corizon Defs.' Ex. 4).)

At some point between November 28, 2017 and December 4, 2017, Plaintiff was transferred back to ASPC-Eyman; Plaintiff's medical records from December 4 and 5, 2017 indicate that his records were available to the ASPC-Eyman medical staff. (*See* Doc. 154-1 at 25–30 (Corizon Defs.' Ex. 5), 34–38 (Corizon Defs.' Ex. 7).)

On December 4, 2017, NP Siji Thomas ordered a diagnostic panel and an INR test. (Doc. 153 ¶ 6.) The same day, Plaintiff submitted an HNR, asking for evaluation of a lump on his scrotum, and he was referred to a provider. (*Id.* ¶ 7.)

On December 5, 2017, Plaintiff saw Nurse Barbra Gallant. Plaintiff was alert and oriented and denied pain. Nurse Gallant performed a physical exam. She noted a small, hardened, round pea-sized lump to his scrotum. The area was not red or warm and did not move. She referred him to a provider. (*Id.* ¶ 8.)

On December 7, 2017, Plaintiff saw NP Thomas. He complained of a lump on his scrotum for the past three weeks and reported minimal pain. Plaintiff reported no prior history of cancer. NP Thomas completed a physical exam. Plaintiff was alert and oriented. NP Thomas observed a pea shaped area on his scrotum about 2x2 centimeters. Plaintiff

had no discharge from his urethra and had no urinary symptoms.  NP Thomas submitted a consult for an ultrasound to further evaluate the area.  (*Id.* ¶ 9.)

On December 15, 2017, Plaintiff's APRI score was 2.329.  (*Id.* ¶ 10.)

On December 26, 2017, Plaintiff saw NP Thomas for chronic care.  Plaintiff denied nausea, vomiting, abdominal pain, muscle or joint pain, constipation, or diarrhea.  NP Thomas ordered a diagnostic panel and advised Plaintiff to avoid high risk behaviors and exercise.  (*Id.* ¶ 11.)

On February 1, 2018, Plaintiff underwent an ultrasound.  Dr. Ross McArthur assessed two right epididymal cysts but no evidence of testicular torsion or epididymitis.  (*Id.* ¶ 12.)

On February 9, 2018, Plaintiff saw Registered Nurse (RN) Matthew Fillicetti.  Plaintiff complained of blood in his stool.  He denied abdominal pain, diarrhea, nausea, and vomiting. RN Fillicetti completed a physical exam.  Plaintiff was alert and oriented, bowel sounds were present, and he had no guarding.  RN Fillicetti provided Plaintiff with hemoccult cards and referred him to a provider.  (*Id.* ¶ 13.)

On February 13, 2018, Plaintiff saw NP Thomas.  Plaintiff complained of blood in his stool.  He denied constipation, abdominal pain, and a history of hemorrhoids.  NP Thomas completed a physical exam.  Plaintiff's abdomen was soft, bowel sounds were present, and he had tenderness in his left lower quadrant.  NP Thomas ordered a diagnostic panel and a hemoccult test.  (*Id.* ¶ 14.)

On February 14, 2018, Plaintiff saw NP Thomas.  Plaintiff reported his cyst was increasing in size and causing pain.  NP Thomas completed an examination.  The area was warm, pink, and dry.  The cyst appeared to be 1-1.5 centimeters.  NP Thomas prescribed 600 milligrams of Ibuprofen twice daily as needed, submitted a consult for urology, and advised Plaintiff to avoid friction to the cyst.  (*Id.* ¶ 15.)  The same day, Plaintiff's hemoccult test returned positive.  (*Id.* ¶ 16.)

On February 21, 2018, the urology consult was assigned an alternative treatment plan (ATP) of conservative management of discomfort related to the epididymal cyst.

Most epididymal cysts do not require surgical intervention and there was no evidence that non-surgical management did not treat his pain.  (*Id.* ¶ 17.)

On February 23, 2018, Plaintiff's APRI score was 0.848 and 1.051 based upon two separate laboratory results.  (*Id.* ¶ 18.)

On March 2, 2018, Plaintiff saw NP Thomas.  Plaintiff reported the blood in his stool had ceased.  Plaintiff denied any other complaints.  NP Thomas completed an exam. Plaintiff's abdomen was soft, non-tender, and bowel sounds were present.  NP Thomas ordered a repeat stool test as Plaintiff's prior test was positive.  (*Id.* ¶ 19.)

On March 7, 2018, Plaintiff submitted an HNR, stating he had bloody stools and lower stomach pain.  (*Id.* ¶ 20.)

On March 8, 2018, Plaintiff saw RN Mary Marino.  Plaintiff complained of blood in his stool for the prior two days, an aching abdomen, and black and tarry stool.  RN Marino noted tenderness to the lower abdomen, but the abdomen was soft and non-distended.  She referred Plaintiff to a provider.  (*Id.* ¶ 21.)

On March 13, 2018, Plaintiff saw NP Thomas.  Plaintiff complained of a dull ache in his abdomen, an empty stomach, and black, tarry, bloody stools.  Plaintiff denied hemorrhoids and denied taking NSAIDs or over-the-counter medications.  NP Thomas completed a physical exam.  Plaintiff's abdomen was soft, but tender in the right upper and lower quadrants.  NP Thomas ordered a diagnostic panel and submitted a consult for gastroenterology.  (*Id.* ¶ 22.)

On March 18, 2018, Plaintiff saw Nurse Barbra Gallant.  Plaintiff complained of abdominal pain with blood in his stool.  Nurse Gallant completed a physical exam. Abdominal bowel sounds were present, and Plaintiff was sensitive to palpation across the upper abdomen.  Plaintiff produced stool samples, which were positive for occult blood. Nurse Gallant called the on-call provider, who ordered alcalack.  Plaintiff stayed in the unit to determine its efficacy.  Plaintiff tolerated it well and was discharged.  NP Linda Okafor also prescribed Omeprazole and ordered a H. Pylori test.  (*Id.* ¶ 23.)

On March 21, 2018, Plaintiff saw NP Thomas.  Plaintiff reported that he had experienced cramping and blood in his stool a few days prior to the appointment.  NP Thomas conducted a physical exam.  Bowel sounds were active, and Plaintiff was tender in the left lower quadrant.  NP Thomas advised Plaintiff a consult had already been submitted for gastroenterology and to follow up with him as needed.  NP Thomas also renewed Omeprazole.  (*Id.* ¶ 24.)

On March 23, 2018, Plaintiff's H. Pylori test returned as negative.  Plaintiff's APRI score was 0.964.  (*Id.* ¶ 25.)

On April 4, 2018, Plaintiff saw NP Thomas. Plaintiff stated he had no bleeding for the past two weeks, but he still had some abdominal pain.  NP Thomas completed a physical exam.  Active bowel sounds were present, but Plaintiff had some left lower quadrant tenderness.  NP Thomas reviewed the recent laboratory results with Plaintiff.  (*Id.* ¶ 26.)

On April 9, 2018, Plaintiff submitted an HNR, stating he had bloody stools, swollen lymph nodes, painful joints, and headaches.  (*Id.* ¶ 27.)

On April 10, 2018, Plaintiff saw Nurse Gallant.  Plaintiff reported body aches and bloody stools.  Nurse Gallant completed a physical exam.  Plaintiff's abdomen was soft and non-tender.  Plaintiff reported pain to his upper mid-gastric area.  Nurse Gallant referred him to a provider.  (*Id.* ¶ 28.)

On April 12, 2018, Plaintiff saw NP Thomas.  Plaintiff reported swollen lymph nodes, headaches, pinching sides, stomach pain, bloody stools, and throbbing testicles.  NP Thomas conducted a physical exam.  Plaintiff's abdomen was soft, non-tender, and bowel sounds were present.  Plaintiff's nasal turbinates were non-erythematous.  He had no congestion, polyps, or cervical lymphadenopathy.  His throat was clear, and his respirations were even and unlabored.  NP Thomas assessed migraines and prescribed Excedrin, which was dispensed through October 8, 2018.  NP Thomas noted the colonoscopy was pending. (*Id.* ¶ 29.)

On April 13, 2018, the gastroenterology consult was assigned an ATP of a colonoscopy to evaluate the bloody stools because a general gastroenterology consult was

not indicated.  (*Id.* ¶ 30.)  On April 16, 2018, NP Thomas submitted a consult for a colonoscopy in accordance with the ATP.  (*Id.* ¶ 31.)

On April 19, 2018, NP Thomas ordered a Hepatitis profile.  Plaintiff was abnormal for Hepatitis A, B, and C.  (*Id.* ¶ 32.)

On May 5, 2018, Plaintiff saw RN Matthew Fillicetti.  Plaintiff reported dark stools. Plaintiff denied abdominal pain, nausea, and vomiting.  RN Fillicetti completed a physical exam.  Plaintiff had bowel sounds present, his posture was erect, and he had no guarding. RN Fillicetti referred him to a provider.  (*Id.* ¶ 33.)

On May 9, 2018, Plaintiff saw NP Thomas. Plaintiff complained of bloody stools and stomach pain.  Plaintiff denied nausea or vomiting.  NP Thomas completed a physical exam.  Plaintiff's abdomen was soft, bowel sounds were present, and there was mild tenderness in the lower quadrant.  NP Thomas noted the colonoscopy was still pending. (*Id.* ¶ 34.)  The same day, Plaintiff's Hepatitis A test returned as negative.  (*Id.* ¶ 35.)

On May 10, 2018, Dr. Sanjay Verma completed a colonoscopy.  Dr. Verma assessed two colonic polyps, diverticulosis, and hemorrhoids.  Dr. Verma recommended a repeat colonoscopy in three years, and CBC and iron studies in three months.  (*Id.* ¶ 36.)

On May 15, 2018, Plaintiff saw NP Thomas.  NP Thomas noted he was still waiting on the colonoscopy report.  Plaintiff reported bloody stools.  He denied weight loss.  NP Thomas completed a physical exam.  Plaintiff's abdomen was soft, non-tender, and bowel sounds were present.  NP Thomas renewed Omeprazole.  (*Id.* ¶ 37.)

The same day, Plaintiff saw RN Augustus Asenguah.  Plaintiff reported abdominal pain. RN Asenguah completed a physical exam.  Plaintiff's abdomen was soft, non-tender, and bowel sounds were present.  Plaintiff stated his pain was tolerable.  RN Asenguah reminded Plaintiff to take it easy and pace himself.  (*Id.* ¶ 38.)

On June 19, 2018, Plaintiff saw NP Thomas for chronic care.  Plaintiff had a history of tattoos and intravenous drug use.  Plaintiff reported being a current smoker and he was 167 pounds.  He denied symptoms, a history of ascites, encephalopathy, and bleeding, and

1  was immune to Hepatitis A.  NP Thomas noted an APRI score of 0.9.  NP Thomas ordered
2  the pneumococcal vaccine and another diagnostic panel.  (*Id.* ¶ 39.)

3  On July 21, 2018, Plaintiff received the pneumococcal vaccine.  (*Id.* ¶ 40.)

4  On August 23, 2018, Plaintiff submitted an HNR, stating he was losing weight and
5  muscle mass.  (*Id.* ¶ 41.)  The following day, Plaintiff saw RN Asenguah.  Plaintiff reported
6  losing weight and muscle mass and feeling fatigued.  He was referred to a provider.  (*Id.* ¶
7  42.)

8  On August 29, 2018, Plaintiff saw NP Thomas.  Plaintiff reported a cyst on his
9  testicles that caused him pain.  Plaintiff reported losing seven pounds since July.  However,
10  he weighed just four pounds less at 163 pounds.  NP Thomas completed a physical
11  examination.  Plaintiff had tenderness upon palpation to his left testicle.  NP Thomas
12  ordered a CEA, diagnostic panel, urine test, Hepatitis B test, and HIV test and submitted a
13  consult for an abdominal ultrasound.  Plaintiff was negative for HIV, Chlamydia,
14  gonorrhea, and Hepatitis B.  Plaintiff's CEA was in the normal range for being a smoker.

15  On September 12, 2018, Plaintiff's APRI score was 1.845 and 2.338 based upon
16  two laboratory tests.  (*Id.* ¶ 44.)

17  On October 4, 2018, Plaintiff saw Dr. Christopher Johnson for his complaints of
18  weight loss.  Plaintiff was 162 pounds.  His laboratory work had returned as normal.  Dr.
19  Johnson recommended continued exercise and eating meals.  Dr. Johnson also renewed
20  Excedrin, which was dispensed through January 6, 2019.  (*Id.* ¶ 45.)

21  On October 26, 2018, the abdominal ultrasound consult was assigned an ATP.
22  Medical necessity was not met as there was no evidence of weight loss, and his APRI score
23  and Fibrosis did not indicate cirrhosis.  (*Id.* ¶ 46.)

24  That same day, Plaintiff was transferred from ASPC-Eyman to ASPC-Florence with
25  his medical file and medications.  (*Id.* ¶ 47.)

26  On December 3, 2018, Plaintiff submitted an HNR, requesting treatment for his
27  scrotal cyst and Hepatitis C.  (*Id.* ¶ 48.)  The same day, Plaintiff saw RN Carrie Andrews.
28  Plaintiff reported that the cyst on his scrotum was painful, occasionally had drainage, and

had increased in size.  Plaintiff also requested Hepatitis B and C treatment. Nurse Andrews completed a physical examination. Plaintiff weighed 165 pounds.   The cyst was approximately 0.5 centimeters and had tenderness upon palpation.  However, there was no drainage.  RN Andrews referred him to a provider.  (*Id.* ¶ 49.)

On December 15, 2018, Plaintiff saw NP Michael Brathwaite for chronic care. Plaintiff weighed 168 pounds.  During the appointment, Plaintiff became irate and disrespectful.  NP Brathwaite noted an APRI score of 1.7.  NP Brathwaite ordered labs, including a Fibrotest, RNA, diagnostic panel, and urinalysis, and rescheduled the chronic care appointment due to Plaintiff's behavior.  Plaintiff's urinalysis was negative.  (*Id.* ¶ 50.)

On December 17, 2018, Plaintiff saw Defendant NP Dorothy Igwe.   Plaintiff requested Hepatitis B and C treatment, and removal and biopsy of his scrotal cyst.  Plaintiff reported he was diagnosed with Hepatitis C in 2008.  He denied intravenous drug use since 2014, and his last tattoo was in 2015.  Plaintiff reported smoking for 20 years and that he had quit two weeks prior.  Plaintiff reported he had the cyst on his scrotum for about a year. He stated it created constant irritation that make it uncomfortable and had occasional oozing.  Defendant Igwe completed a physical exam.  She noted a small palpable cyst that was smaller than one centimeter.  She noted the measurement of the area so that it could be referenced for change in size at later evaluations.   She observed no color change, swelling, edema, lesions, or penile discharge.  There was no indication that the cyst was infected.  (*Id.* ¶ 51.)

Defendant Igwe reviewed Plaintiff's recent laboratory results and calculated his APRI score.  She noted his APRI score had increased.  However, based upon his laboratory results and her assessment, there was no evidence that Plaintiff had cirrhosis.  Defendant Igwe reviewed the ATP plan of the ultrasound and the colonoscopy report.  She ensured that both had been reviewed with Plaintiff.  She then recommended an x-ray because she suspected Plaintiff may be suffering from constipation.  Defendant Igwe also ordered a CBC, hemoccult test, iron studies, and a repeat colonoscopy in three years, pursuant to Dr.

Verma's recommendation.  Defendant Igwe noted Plaintiff had an active prescription for Excedrin.  Defendant Igwe reminded Plaintiff to avoid high risk behaviors.  Plaintiff was very argumentative during the visit, and Defendant Igwe had to remind him to use respectful language.  Plaintiff's iron was normal, but he had slightly high TIBC, which indicated a possible minimal iron deficiency.  Plaintiff's CBC was also normal.  Plaintiff's x-ray showed a large volume of stool, no free air, bowel obstruction, or pathologic calcifications.  The results indicated Plaintiff had constipation, but no other issues.  (*Id.*) The same day, Plaintiff submitted an HNR, requesting a biopsy of his scrotal cyst.  (*Id.* ¶ 52.)

On December 20, 2018, Plaintiff's APRI score was 0.897.  (*Id.* ¶ 53.)  Plaintiff's CTP total was 5 points, which is the lowest score possible and is considered Class A.  (*Id.* ¶ 107.)  Among patients with cirrhosis, which Plaintiff did not have, Class A reflects the best liver compensation.  (*Id.* ¶ 7.)

On January 22, 2019, Plaintiff submitted a grievance and asked for Hepatitis B and C treatment.  (*Id.* ¶ 54.)

On January 29, 2019, Plaintiff saw Defendant Igwe regarding his gastroenterology imaging.  Plaintiff was disrespectful and stated, "You are not doing any shit for me." Plaintiff would not cooperate with her assessment.  Therefore, Defendant Igwe informed Plaintiff that she would end the visit if he continued not to cooperate.  Plaintiff stated he would tell his lawyer to sue her and then left.  (*Id.* ¶ 55.)

The same day, Defendant Perkins responded to Plaintiff's formal grievance dated January 22, 2019.  Perkins reviewed the medical record and grievance and responded that based upon his review, providers had determined that Plaintiff did not have Hepatitis B. Plaintiff was priority level 2 based upon clinical indications from providers, including his APRI score.  Defendant Perkins informed Plaintiff that Corizon followed the BOP guidelines and the Health Services Technical Manual, and he was not the appropriate priority level for treatment.  As such, his providers would continue to monitor his Hepatitis C.  (*Id.* ¶ 56.)

On February 11, 2019, Plaintiff submitted two HNRs with Defendant Igwe's name at the top, requesting a biopsy for his cyst and Hepatitis treatment.  (*Id.* ¶ 57.)

On February 12, 2019, Plaintiff saw Nurse Andrews.  Plaintiff requested a biopsy of the cyst on his scrotum.  Nurse Andrews completed a physical examination and observed that the bump on his scrotum was 1 centimeter.  Plaintiff denied pain and stated he was concerned about cancer.  He saw her again later that day.  He requested a liver biopsy and treatment of Hepatitis C.  (*Id.* ¶ 58.)

On February 15, 2019, Plaintiff wrote two inmate letters.  He requested Hepatitis B and C treatment, and a biopsy of his scrotal cyst.  (*Id.* ¶ 59.)

On February 18, 2019, Defendant Igwe ordered a Hepatitis C genotype test.  (*Id.* ¶ 60.)

On February 20, 2019, Plaintiff saw Defendant Igwe and requested a biopsy of his scrotal cyst.   He reported pain and that the cyst had been splitting and bleeding intermittently.  Plaintiff reported the cyst was increasing in size and getting worse.  Plaintiff reported constipation and occasional bloody stools.  Plaintiff stated his colonoscopy results were not previously reviewed with him.  Plaintiff denied dysuria, swelling, and penile discharge.  Plaintiff requested a liver biopsy and Hepatitis C treatment.  Defendant Igwe completed a physical examination and observed a cyst measuring 0.7 x 0.7 centimeters.  There was no bleeding, discharge, rash, edema, erythema, or lesions.  Moreover, the cyst did not appear to be bigger than at the last exam.  There was no indication of infection.  (*Id.* ¶ 61.)

Based upon Plaintiff's laboratory results and Defendant Igwe's assessment, there was still no indication that Plaintiff was suffering from cirrhosis.  Plaintiff's APRI score had lowered, he had no symptoms, and his laboratory results did not indicate fibrosis or decreased liver function.  Therefore, Hepatitis C treatment was not indicated.  Defendant Igwe reviewed the previous ultrasound and colonoscopy results and explained the results to Plaintiff.  Defendant Igwe ordered a urinalysis and urine culture to completely rule out infection of the scrotal cyst, and she ordered a hemoccult for any possible additional

1    gastrointestinal issues. She prescribed Docusate and Lactulose to treat Plaintiff's

2    constipation and emailed the Hepatitis C committee about possible treatment to reassure

3    Plaintiff that he was not eligible for treatment. Based upon her conversation with Plaintiff,

4    she believed he wanted a second opinion that he was not a priority for treatment. Defendant

5    Igwe renewed Excedrin. Plaintiff's urinalysis and urine culture were negative, which ruled

6    out infection of the cyst. Therefore, there was no medical indication for biopsy or an

7    additional ultrasound. (*Id.*)

8         On February 21, 2019, Plaintiff had a Hepatitis C genotype test which reported

9    Hepatitis C genotype 3. This test also confirms ongoing Hepatitis C infection and is

10   important in selecting specific treatment. It does not correlate with severity of liver damage

11   and does not have a role in monitoring Hepatitis C or prioritizing treatment. Hepatitis C

12   genotype 3 is often associated with significant liver inflammation, which can elevate the

13   blood level of the AST enzyme from the liver. Since that enzyme level appears in the

14   numerator of the APRI, it can elevate the APRI in the absence of advanced liver fibrosis.

15   The Fibrotest/Actitest, or other more specific tests for liver fibrosis, can clarify the cause

16   of the elevated APRI, as occurred in Plaintiff's case. Plaintiff's Fibrotest/Actitest did not

17   indicate advanced (stage 3 or 4) liver fibrosis but did indicate significant inflammation.

18   Significant inflammation does not prioritize treatment as there was no evidence of

19   advanced fibrosis or inadequate liver function. (*Id.* ¶ 110.)

20        On February 27, 2019, Defendant Vanessa Headstream responded to Plaintiff's

21   inmate letters. Defendant Headstream reviewed Plaintiff's medical records. Based upon

22   her review, she informed Plaintiff that he would be notified if he was prioritized for

23   treatment based upon the BOP guidelines utilized by the contract healthcare vendor. She

24   further informed him that his Hepatitis B results reported negative test results. Finally, she

25   informed him that the biopsy of the scrotal cyst was a clinical decision, rather than an

26   administrative decision. Her responses were the same to Plaintiff's letters because he

27   complained of the same issues in both letters. (*Id.* ¶ 62.)

28        On March 7, 2019, NP Hahn renewed Excedrin, Lactulose, and Docusate. (*Id.* ¶ 63.)

On March 18, 2019, Plaintiff submitted an HNR regarding his scrotal cyst.  Nurse Andrews responded that his ultrasound showed no evidence of testicular torsion or epididymitis.  (*Id.* ¶ 64.)

On March 28, 2019, Plaintiff reported he had a bowel movement daily with no concerns, and he denied nausea, vomiting, diarrhea, or constipation.  Plaintiff did not discuss his scrotal cyst or Hepatitis C with Defendant Igwe during this encounter.  (*Id.* ¶ 65.)

On April 17, 2019, Defendant Igwe renewed Docusate.  (*Id.* ¶ 66.)

On May 12, 2019, Plaintiff submitted an HNR requesting treatment for Hepatitis B and C.  Nurse Rentz responded that a provider had explained the criteria for treatment and that Plaintiff could submit an inmate letter.  (*Id.* ¶ 67.)

On May 28, 2019, Defendant Igwe ordered a diagnostic panel and an INR test.  (*Id.* ¶ 68.)  The following day, Defendant Igwe renewed Docusate.  (*Id.* ¶ 69.)

On May 30, 2019, Plaintiff's APRI score was 1.206.  (*Id.* ¶ 70.)

On June 1, 2019, Defendant Dr. Rodney Stewart prescribed Ibuprofen 600 mg.  (*Id.* ¶ 71.)

On June 4, 2019, Defendant Igwe prescribed Ibuprofen 600 mg.  (*Id.* ¶ 72.)

On June 8, 2019, Plaintiff submitted two HNRs requesting treatment for Hepatitis B and C and a scrotal cyst biopsy.  Nurse Cluff referred him to a provider.  Plaintiff's HNR regarding Hepatitis B and C had Defendants Igwe and Stewart's names at the top.  (*Id.* ¶ 73.)

On June 10, 2019, Plaintiff saw Defendant Igwe for chronic care.  Plaintiff requested Hepatitis C treatment and the Hepatitis B vaccine.  Plaintiff reported abdominal discomfort and stool leakage, but denied vomiting, abdominal pain, swelling, bleeding, bruising, icterus, jaundice, cold intolerance, pruritus, fatigue, leg swelling, and appetite issues.  Plaintiff reported smoking seven cigarettes a day.  Defendant Igwe reviewed his recent APRI score, which had increased slightly.  Defendant Igwe reviewed the Hepatitis C committee denial of treatment with Plaintiff.  The Hepatitis C committee reviewed

Plaintiff's APRI score, albumin, bilirubin, platelets, and CTP score and noted Plaintiff's albumin, bilirubin, and platelets were normal, and Defendant Igwe agreed these results were normal.  Plaintiff's CTP score was 5, which is the lowest score.  Plaintiff had no history of encephalopathy, ascites, or esophageal bleed.  Therefore, Plaintiff was considered priority 3 and was not a priority for treatment.  Defendant Igwe agreed with the committee's determination and advised Plaintiff to avoid high risk behaviors, quit smoking, and continued monitoring of Hepatitis C.  Defendant Igwe offered pain medication, but Plaintiff declined, and Defendant Igwe ordered a stool culture and hemoccult test to evaluate his gastrointestinal symptoms.  His hemoccult and stool culture were negative.  Therefore, there was no indication of infection or presence of blood, and no further treatment was indicated.  (*Id.* ¶ 74.)

On June 12, 2019, Plaintiff saw Defendant Igwe.  Plaintiff stated he had a cyst on his scrotum that made him uncomfortable, made it difficult to walk, and it had increased in size.  Plaintiff requested pain medication for back and joint pain.  Defendant Igwe completed a physical examination and observed a cyst that had no significant change from 4 months prior.  There was no bleeding, discharge, rash, edema, erythema, or skin lesion.  Defendant Igwe also noted his urine culture had no growth.  Therefore, there was no indication that his cyst was infected.  Defendant Igwe requested a urology consult to rule out other causes of Plaintiff's cyst.  Defendant Igwe reviewed Plaintiff's Hepatitis B testing, noting Plaintiff was negative for Hepatitis B, and therefore ordered a Hepatitis B vaccine.  Finally, Defendant Igwe prescribed alpha lipoic acid, Ibuprofen, and a Ketorolac injection for Plaintiff's pain.  (*Id.* ¶ 75.)

On August 10, 2019, Plaintiff underwent another ultrasound.  Dr. Shane Bezzant assessed multiple bilateral epididymal cysts, but no sign of torsion or testicular mass.  (*Id.* ¶ 76.)

### 3.    Plaintiff's Medical Treatment under ADC/Centurion

Centurion took over as ADC's healthcare contractor on July 1, 2019.  (Doc. 165 (Centurion Defs.' Statement of Facts) ¶ 1.)  Plaintiff has chronic care visits every 6 months

to check on the status of his Hepatitis C.  (*Id.* ¶ 2.)  Plaintiff had chronic care visit on December 2, 2019 and a follow-up appointment on December 10, 2019.  (*Id.* ¶¶ 2, 3.) Plaintiff is HIV and Hepatitis B negative.  (*Id.* ¶ 8.)

As of December 19, 2019, Plaintiff's records indicate that he did not meet the criteria for Hepatitis C treatment.  (*Id.* ¶ 5.)  Plaintiff has not met the criteria for Hepatitis C treatment for several reasons.  As of December 2019, Plaintiff's Fibrotest/Actitest showed he had scores of F1 and F2 (minimal fibrosis), and his APRI score was 0.762.  (*Id.* ¶¶ 6, 7.)

For these reasons, and the fact that he has no indication of cirrhosis—Plaintiff has been placed in a lower priority level (which means that those patients scoring higher or with more complicating conditions would be priority for treatment first).  With a Fibrosis score of F1-F2, absence of any co-infection and absence of any evidence of liver cirrhosis, Plaintiff is not in a priority group for treatment under Centurion's policies.

Centurion does not rely only on APRI scores in determining treatment priority. Centurion prioritizes those with fibrosis scores of F3 and F4 for treatment.  Centurion will consider an F2 if there is co-infection such as Hepatitis B or HIV or another co-morbid condition that increases the health risks.  (*Id.* ¶ 11.)

Centurion's process is very similar to the triaging of patients for treatment in the community and matches the most recent Hepatitis C Guidelines as published in May 2018 by the AASLD (American Association for the Study of Liver Diseases), and by IDSA (Infectious Diseases Society of America); the process is also consistent with the latest November 2019 AASLD/ISLD guidelines that center on testing, evaluation and monitoring recommendations for those for whom treatment is deferred (like in the prison setting for those with lower fibrosis scores or who are in the phases of counseling, assessment and workup), as well as ADC's policy regarding Hepatitis C.  (*Id.* ¶ 12.)

Centurion has a specialist in Hepatitis C who advises regarding testing and treatment, including reviewing all patients that reach a priority level for treatment.  (*Id.* ¶ 13.)  Further, under Centurion's policies, patients who are positive for Hepatitis C, but are

not progressing to a higher priority, continue to be followed every 6 months with laboratory testing.  (*Id.* ¶ 14.)  If Plaintiff's results show he has progressed to F3 or F4, his case will be re-evaluated by the Hepatitis C specialist at that time to determine if he has become a candidate for direct acting antivirals.  (*Id.* ¶ 15.)

Defendant Igwe has seen and treated Plaintiff to address his concerns regarding his scrotal cysts, as well as other complaints regarding shoulder pain, stomach pain, and hemorrhoids to include having ultrasound and x-rays performed, requesting approval of a colonoscopy, referring for outside gastroenterology and urology appointments, and offering pain medications.  (*Id.* ¶ 16.)

On January 7, 2020, Defendant Igwe saw Plaintiff to discuss x-rays and cortisone injections and advised him regarding his Hepatitis C and again emailed the Hepatitis C Committee regarding Plaintiff's latest test results.  (*Id.* ¶ 19.)  The next day, Defendant Igwe gave Plaintiff cortisone injections in his shoulder.  (*Id.* ¶ 20.)

Following the December chronic care visit, Plaintiff received another appointment regarding his Hepatitis C in January 2020, and he was notified that his test results confirmed he still had a fibrosis score of F1, which indicates minimal fibrosis, and no finding of cirrhosis; Defendant Igwe sent follow-up emails to the Hepatitis C Committee regarding the test results and any further recommendations for his Hepatitis C.  (*Id.* ¶ 21.)

On January 17, 2020, Plaintiff was sent to an off-site consultation with urologist Peter Niemczyk, who recommended Plaintiff undergo a spermatocelectomy in order to remove sperm-filled cysts inside his scrotum.  (*Id.* ¶ 22.)

On February 4, 2020, Defendant RN Pontious entered a prescription order for Montelukast per direction from Defendant Igwe.  (*Id.* ¶ 24.)

Centurion approved the surgical procedure and Plaintiff underwent the spermatocelectomy on February 13, 2020, without incident and with instructions to follow up with Dr. Niemczyk as soon as possible.  (*Id.* ¶ 25.)  In addition to being seen by a nurse upon his return from the surgical procedure and having an order put in for pain medication, a Centurion nurse followed up with Plaintiff the next day to evaluate his scrotal incisions

and educate him on proper postsurgical care which included medical ice, wearing scrotal support, and monitoring the surgical site for infection; Plaintiff indicated he did not want to take any pain medications.  (*Id.* ¶ 26.)

By February 24, 2020, Centurion providers noted the surgical incision was well-healed with no sign of infection, and they continued to monitor him for infection while a follow-up appointment with Dr. Niemczyk was scheduled.  (*Id.* ¶ 27.)

On May 25, 2020, Plaintiff presented for a health services encounter with Defendant Igwe for his Hepatitis C, but denied any symptoms including abdominal pain/swelling, bleeding, bruising problems, jaundice, leg swelling, temperature intolerance, or fatigue, and Defendant Igwe went over diagnostic panel results as well; Plaintiff remained stable, and Defendant Igwe also followed up regarding scheduling of the post-operative examination.  (*Id.* ¶ 28.)

Plaintiff attended a post-operative urology consult on July 18, 2020, and Dr. Niemczyk noted that no follow-up was needed, other than ordering a sperm count test to be done by an off-site provider in April of 2021; he also did not note any infection or any other injury of the surgical site.  (*Id.* ¶ 29.)  Defendant Pontius reviewed Dr. Niemczyk's recommendations and determined no follow-up scheduling was necessary.  (*Id.* ¶ 30.)

Other than reviewing the July 18, 2020 urology specialist notes regarding no need for follow-up, and ordering the prescription for Plaintiff on February 4, 2020, per the direction of Defendant Igwe, the only other interaction or role in Plaintiff's care that Defendant Pontious had was to renew other medications at the direction Defendant Igwe (no encounter with Plaintiff), and one immunization/flu vaccination (mass vaccination—prisoners lined up and no substantive interaction).  (*Id.* ¶ 33.)

**C.    Discussion**

**1.    Hepatitis C and Scrotal Cyst (Counts 1 and 2)**

Defendants do not dispute that Plaintiff's Hepatitis C and scrotal cyst constitute serious medical needs, and the evidence that Plaintiff's providers thought his Hepatitis C and scrotal cyst were worthy of comment and monitoring through chronic care visits,

regular lab tests, and ultrasound testing is sufficient to make this showing.  The Court's analysis therefore turns on whether Defendants were deliberately indifferent to Plaintiff's serious medical needs.  This inquiry "must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988); *see Rizzo v. Goode*, 423 U.S. 362, 370–71, 375–77 (1976).

**a.   Defendants Stewart, Robertson, Headstream, and Perkins**

The record shows that Defendants Stewart, Robertson, and Headstream had minimal involvement in Plaintiff's medical care.

In response to Plaintiff's January 22, 2019 grievance asking for Hepatitis B and C treatment, Defendant Perkins reviewed Plaintiff's medical record and informed Plaintiff that his providers had determined that he did not have Hepatitis B and that he was priority level 2 for Hepatitis C treatment based upon clinical indications, including his APRI score. (Doc. 153 ¶ 54, 56.)  Defendant Perkins informed Plaintiff that Corizon followed the BOP guidelines and the Health Services Technical Manual, that he was not the appropriate priority level for treatment based on these guidelines, and that his providers would continue to monitor his Hepatitis C.  (*Id.* ¶¶ 56.)

On February 27, 2019, Defendant Vanessa Headstream responded to Plaintiff's inmate letters regarding Hepatitis C treatment, stating that she had reviewed Plaintiff's medical records, and she informed Plaintiff that he would be notified if he was prioritized for treatment based upon the BOP guidelines utilized by the contract healthcare vendor. (*Id.* 153 ¶ 62.)  She further informed Plaintiff that his Hepatitis B test results were negative and that the biopsy of the scrotal cyst was a clinical decision, rather than an administrative decision.  (*Id.*)   Defendant Headstrem is a registered nurse, but she serves in an administrative capacity only and does not personally provide medical treatment to prisoners, nor does she have authority to order medical providers to provide certain treatments.  (*Id.* ¶ 78.)

On June 1, 2019, Defendant Stewart prescribed Ibuprofen 600 mg. (*Id.* ¶ 71.) On June 8, 2019, Plaintiff submitted two HNRs—with Defendant Igwe and Stewart's names at the top—requesting treatment for Hepatitis B and C and a scrotal cyst biopsy. (*Id.* ¶ 73.) In response, Nurse Cluff referred him to a provider, and Plaintiff was seen by Defendant Igwe for chronic care two days later. (*Id.* ¶ 74.)

The record does not show that Defendant Robertson had any direct interaction with Plaintiff.

On these facts, the record does not support a finding that Defendants Stewart, Robertson, and Headstream's limited involvement in Plaintiff's medical treatment amounted to deliberate indifference, and Plaintiff's statements regarding their involvement in the Second Amended Complaint fail to create a genuine issue of fact for trial.

Specifically, Plaintiff asserts that he submitted a grievance on January 22, 2019 regarding his Hepatitis C, and Defendant Perkins responded that Plaintiff's "current APRI score [wa]s 0.871[,] which did not warrant treatment." (Doc. 116 at 10.) In addition, Plaintiff asserts that he submitted an informal complaint to Defendant Perkins on March 29, 2019, but Defendant Perkins did not respond. (*Id.* at 17.) Plaintiff also asserts that he sent multiple inmate letters to Defendants Headstream and Robertson in February and April 2019 regarding his Hepatitis C and the cyst on his scrotum. (*Id.* at 16–17.) Plaintiff asserts that Defendant Robertson did not respond, and that Defendant Headstream provided a "form" response that "countless other prisoners have received." (*Id.*) Plaintiff states that on May 12, 2019, he submitted an HNR to Defendant Stewart requesting Hepatitis B and C treatment, and in response, Plaintiff was told that the provider had explained the Hepatitis C treatment and criteria and that he could submit an inmate letter. (*Id.* at 9.) Plaintiff also asserts that Defendant Igwe told him that Defendants Stewart and Robertson ordered employees not to give patients pain medications. (*Id.* at 11.)

However, these assertions, many of which are refuted by Plaintiff's medical records, are insufficient to create a genuine issue of material fact for trial that Defendants Stewart,

Robertson, and Headstream were deliberately indifferent to Plaintiff's serious medical needs.

First, the record shows that when he responded to Plaintiff's January 2019 grievance, Defendant Perkins was a Facility Health Administrator, whose duties included reviewing and responding to formal grievances. (*Id.* ¶ 82.) Defendant Perkins' duties did not include personally providing medical care to prisoners, and he was not authorized to make clinical decisions or direct Corizon medical providers to provide particular treatment to prisoners. (*Id.*) When responding to grievances, Defendant Perkins reviewed prisoners' medical charts, conferred with providers, and escalated any issues to Corizon officials with review authority, including the Site Medical Director or Regional Medical Director, when appropriate. (*Id.*) Similarly, the record shows that Defendant Headstream responded to Plaintiff's February 2019 inmate letter and informed him that he was negative for Hepatitis B and that he would be notified if he was prioritized for Hepatitis C treatment. (*Id.* ¶ 62.)

There is no evidence that Defendants Headstream and Perkins were authorized to dictate Plaintiff's treatment or that either of them was authorized to order Hepatitis C treatment for Plaintiff or any other prisoners. In fact, the evidence shows that authorizing Hepatitis C treatment was the responsibility of the Corizon Hepatitis C Committee and Centurion's Hepatitis C specialist. (Doc. 153 ¶ 105; Doc. 165 ¶¶ 13–15.) Even if Defendant Headstream's responses to subsequent inmate letters mirrored her February 2019 inmate letter response, this is not sufficient to show that she deliberately disregarded Plaintiff's serious medical needs where Plaintiff's medical records showed that his priority for Hepatitis C treatment had not changed and that cirrhosis and infection of the scrotal cyst had recently been ruled out. (*See id.* ¶¶ 61, 110.)

Additionally, even if Plaintiff addressed inmate letters to Defendants Perkins and Robertson that went unanswered, these letters have not been provided in the record. Defendant Robertson asserts that he never received any inmate letters from Plaintiff. (*Id.* ¶ 79.) Absent evidence additional facts regarding the specific contents of the letters or evidence showing that Defendants Perkins and Robertson received the letters and

1    disregarded them, Plaintiff's unsupported assertions are insufficient to create a genuine

2    issue of fact to survive summary judgment.

3         Lastly, Plaintiff's statement that Defendants Stewart and Robertson ordered Corizon

4    employees not to prescribe pain medication is belied by evidence in the record showing

5    that Plaintiff was prescribed Ibuprofen, Excedrin, and a Ketorolac injection to manage his

6    pain, including a June 1, 2019 prescription for Ibuprofen that was ordered by Defendant

7    Stewart.  (*Id.* ¶¶ 15, 29, 51, 71–72, 75.)

8         Defendants Perkins and Headstream's responses to Plaintiff's administrative

9    complaints do not show that these Defendants ignored any serious medical needs or

10   "knowingly fail[ed] to respond to [Plaintiff's] requests for help."  *Peralta v. Dillard*, 744

11   F.3d 1076, 1086 (9th Cir. 2014).  Instead, they reviewed Plaintiff's medical records and

12   verified that his medical providers made their treatment decisions based on their

13   monitoring of Plaintiff's lab results and symptomology, and they confirmed that, based on

14   the relevant policies and guidelines for treating Hepatitis C at the time, Plaintiff was

15   receiving appropriate care.

16        On these facts, the record does not support a finding that Defendants Stewart,

17   Robertson, Headstream, and Perkins' minimal involvement in the treatment of Plaintiff's

18   Hepatitis C and scrotal cyst amounted to deliberate indifference, and Plaintiff has failed to

19   create a genuine issue of fact as to these issues.  Accordingly, Plaintiff's Eighth

20   Amendment claims against Defendants Stewart, Robertson, Headstream, and Perkins

21   regarding treatment of his Hepatitis C and scrotal cyst will be dismissed.

### b.    Defendant Igwe

23        The record does not support a finding that Defendant Igwe's response to Plaintiff's

24   serious medical needs amounted to deliberate indifference.

25        Plaintiff asserts that during his December 17, 2018 appointment, Defendant Igwe

26   would not address Plaintiff's medical issues or concerns, would not allow Plaintiff to take

27   notes, and, when Plaintiff requested a liver biopsy and Hepatitis B and C treatment or cures,

28   Igwe said that Plaintiff did not "get to dictate treatment or who provides the treatment."

(Doc. 116 at 8–9.)  Plaintiff contends that his recent test results showed he had abnormally high AST, ALT, viral load, and "Log-10"; minimal fibrosis, and significant liver inflammation.  (*Id.*)

Plaintiff's assertion that Defendant Igwe refused to address his medical concerns on December 17, 2018 is not supported by his medical records, which show that on December 17, 2018, Plaintiff saw Defendant Igwe and requested Hepatitis B and C treatment, and removal and biopsy of his scrotal cyst.  (Doc. 153 ¶ 51.)  Upon physical examination, Defendant Igwe noted a small palpable cyst that was smaller than one centimeter but observed no color change, swelling, edema, lesions, or penile discharge, and there was no indication that the cyst was infected.  (*Id.*)  Defendant Igwe reviewed Plaintiff's recent laboratory results and calculated his APRI score and noted his APRI score had increased.  (*Id.*)  However, based upon Plaintiff's laboratory results and her assessment, there was no evidence that Plaintiff had cirrhosis.  Defendant Igwe reviewed the ATP for an ultrasound and the colonoscopy report and ensured that both had been reviewed with Plaintiff.  (*Id.*)  She recommended an x-ray because she suspected Plaintiff may be suffering from constipation.  (*Id.*)  Defendant Igwe also ordered a CBC, hemoccult test, iron studies, and a repeat colonoscopy in three years, pursuant to Dr. Verma's recommendation.  (*Id.*)  Defendant Igwe noted Plaintiff had an active prescription for Excedrin and reminded Plaintiff to avoid high risk behaviors.  (*Id.*)  Plaintiff's iron was normal, but he had slightly high TIBC, which indicated a possible minimal iron deficiency, and his CBC was also normal.  Plaintiff's x-ray showed a large volume of stool with no free air, bowel obstruction, or pathologic calcifications, which indicated Plaintiff had constipation, but no other issues.  (*Id.*)

Plaintiff states that he was called to the medical department on January 29, 2019, but Defendant Igwe refused to see him because Plaintiff had allegedly cursed at her.  (Doc. 116 at 9.)  However, Plaintiff's medical records show that he saw Defendant Igwe on January 29, 2019 regarding his gastroenterology imaging.  (Doc. 153 ¶ 55.)  Defendant Igwe noted that Plaintiff was being disrespectful, and that Plaintiff told her, "You are not

doing any shit for me." (*Id.*)  Defendant Igwe noted that Plaintiff would not cooperate during the assessment, and Defendant Igwe informed Plaintiff that she would end the visit if he continued not to cooperate.  (*Id.*)  Plaintiff stated he would tell his lawyer to sue her and then left.  (*Id.*)  Construing the facts in Plaintiff's favor, even if Defendant Igwe ended the appointment early, Plaintiff does not deny that he cursed at her, and it was not deliberately indifferent to cut short an appointment with a patient who had become aggressive and disruptive.

On February 11, 2019, Plaintiff submitted two HNRs with Defendant Igwe's name at the top, requesting a biopsy for his cyst and Hepatitis treatment.  (*Id.* ¶ 57.)  On February 18, 2019, Defendant Igwe ordered a Hepatitis C genotype test.  (*Id.* ¶ 60.)

Plaintiff asserts he submitted HNRs to Defendant Igwe in December 2018 and February and March 2019 requesting that the cyst on his scrotum be removed and biopsied to test for cancer and indicating that the cyst continued to increase in size and continued to cause discomfort.  (Doc. 116 at 16–17.)  Plaintiff asserts that on February 20, 2019, Defendant Igwe refused to request a biopsy, laughed at Plaintiff, and told him that Defendant "Corizon will not pay for that[;] they already performed an ultrasound, and you[']r[e] a prisoner; what more do you want[?]"  (*Id.*)

Plaintiff's medical records show that on February 20, 2019, he saw Defendant Igwe and requested a biopsy of his scrotal cyst.  (Doc. 153 ¶ 61.)  Plaintiff reported pain and that the cyst had been splitting and bleeding intermittently, was increasing in size, and getting worse.  (*Id.*)  Plaintiff reported constipation and occasional bloody stools and that his colonoscopy results were not previously reviewed with him.  (*Id.*)  Plaintiff denied dysuria, swelling, and penile discharge.  (*Id.*)  Plaintiff requested a liver biopsy and Hepatitis C treatment.  (*Id.*)  Defendant Igwe completed a physical examination and observed a cyst measuring 0.7 x 0.7 centimeters but did not observe any bleeding, discharge, rash, edema, erythema, or lesions.  (*Id.*)  Moreover, the cyst did not appear to be bigger than her last exam, and there was no indication of infection.  (*Id.*)  Based upon Plaintiff's laboratory results and Defendant Igwe's assessment, there was still no indication that Plaintiff was

suffering from cirrhosis.  (*Id.*)  Plaintiff's APRI score had lowered, he had no symptoms of advanced fibrosis, and his laboratory results did not indicate fibrosis or decreased liver function.  (*Id.*)  Therefore, Hepatitis C treatment was not indicated.  (*Id.*)  Defendant Igwe reviewed the previous ultrasound and colonoscopy results and explained the results to Plaintiff, ordered a urinalysis and urine culture to completely rule out infection of the scrotal cyst, and ordered a hemoccult for any possible additional gastrointestinal issues. (*Id.*)  She prescribed Docusate and Lactulose to treat Plaintiff's constipation and emailed the Hepatitis C Committee about possible treatment to reassure Plaintiff that he was not eligible for treatment.  (*Id.*)  Based upon her conversation with Plaintiff, Defendant Igwe believed he wanted a second opinion that he was not a priority for treatment.   (*Id.*) Defendant Igwe renewed Excedrin.  Plaintiff's urinalysis and urine culture were negative, which ruled out infection of the cyst.  (*Id.*)  Based on her assessment and professional judgment, Defendant Igwe determined there was no medical indication for biopsy or an additional ultrasound.  (*Id.*)

During his March 28, 2019 appointment with Defendant Igwe, Plaintiff reported he had a bowel movement daily with no concerns, and he denied nausea, vomiting, diarrhea, or constipation.  (*Id.* ¶ 65.)  Plaintiff did not discuss his scrotal cyst or Hepatitis C with Defendant Igwe during this encounter.  (*Id.*)

On April 17, 2019, Defendant Igwe renewed Docusate.  (*Id.* ¶ 66.)  On May 28, 2019, Defendant Igwe ordered a diagnostic panel and an INR test.  (*Id.* ¶ 68.)  The following day, Defendant Igwe renewed Docusate.  (*Id.* ¶ 69.)  On June 4, 2019, Defendant Igwe prescribed Ibuprofen 600 mg.  (*Id.* ¶ 72.)

On June 8, 2019, Plaintiff submitted two HNRs requesting treatment for Hepatitis B and C and a scrotal cyst biopsy.  (*Id.* ¶ 73.)  Plaintiff's HNR regarding Hepatitis B and C had Defendants Igwe and Stewart's names at the top.  (*Id.*)  Plaintiff was seen by Defendant Igwe 2 days later on June 10, 2019 for a chronic care appointment.  (*Id.* ¶ 74.) Plaintiff requested Hepatitis C treatment and the Hepatitis B vaccine and reported abdominal discomfort and stool leakage, but denied vomiting, abdominal pain, swelling,

bleeding, bruising, icterus, jaundice, cold intolerance, pruritus, fatigue, leg swelling, and appetite issues. (*Id.*)  Defendant Igwe reviewed Plaintiff's recent APRI score, which had increased slightly, and reviewed the Hepatitis C Committee denial of treatment with Plaintiff.  (*Id.*)  The Hepatitis C Committee reported reviewing Plaintiff's APRI score, albumin, bilirubin, platelets, and CTP score and noted that his albumin, bilirubin, and platelets were normal.  (*Id.*)  Defendant Igwe agreed these results were normal.  (*Id.*)  Plaintiff's CTP score was 5, which is the lowest score.  (*Id.*)  Plaintiff had no history of encephalopathy, ascites, or esophageal bleed.  (*Id.*)  Therefore, Plaintiff was considered priority 3 and was not a priority for treatment.  (*Id.*)  Defendant Igwe agreed with this determination.  (*Id.*)  Defendant Igwe advised Plaintiff to avoid high risk behaviors, quit smoking, and continued monitoring of Hepatitis C.  (*Id.*)  Defendant Igwe offered pain medication, but Plaintiff declined.  (*Id.*)  Defendant Igwe further ordered a stool culture and hemoccult test to evaluate his gastrointestinal symptoms.  (*Id.*)  Plaintiff's hemoccult and stool culture were negative, and there was no indication of infection or presence of blood, and no further treatment was indicated.  (*Id.*)

On June 12, 2019, Plaintiff saw Defendant Igwe and reported he had a cyst on his scrotum that made him uncomfortable, made it difficult to walk, and it had increased in size. (*Id.* ¶ 75.)  Plaintiff requested pain medication for back and joint pain.  (*Id.*)  Upon physical examination, Defendant Igwe observed a cyst that had no significant change from four months prior.  (*Id.*)  There was no bleeding, discharge, rash, edema, erythema, or skin lesion.  (*Id.*)  Defendant Igwe also noted Plaintiff's urine culture had no growth.  (*Id.*)  Therefore, there was no indication that the cyst was infected.  (*Id.*)  Defendant Igwe requested a urology consult to rule out other causes of Plaintiff's cyst.  (*Id.*)  Defendant Igwe reviewed Plaintiff's Hepatitis B testing and noted Plaintiff was negative for Hepatitis B.  (*Id.*)  Therefore, Defendant Igwe ordered a Hepatitis B vaccine. (*Id.*)    Finally, Defendant Igwe prescribed alpha lipoic acid, Ibuprofen, and a Ketorolac injection for Plaintiff's pain.  (*Id.*)

On January 7, 2020, Defendant Igwe saw Plaintiff to discuss x-rays and cortisone injections and again advised him regarding his Hepatitis C.  (Doc. 165 ¶ 19.)  Defendant Igwe notified Plaintiff that his test results confirmed he still had a fibrosis score of F1, which indicates minimal fibrosis, and no finding of cirrhosis; Defendant Igwe sent follow-up emails to the Hepatitis C Committee regarding the test results and any further recommendations for his Hepatitis C.  (*Id.* ¶¶ 19, 21.)  The next day, Defendant Igwe gave Plaintiff cortisone injections in his shoulder.  (*Id.* ¶ 20.)

On May 25, 2020, Plaintiff had an appointment with Defendant Igwe for his Hepatitis C, and he denied any symptoms including abdominal pain/swelling, bleeding, bruising problems, jaundice, leg swelling, temperature intolerance, or fatigue, and Defendant Igwe went over diagnostic panel results as well; Plaintiff remained stable, and Defendant Igwe also followed up regarding scheduling of the post-operative examination.  (*Id.* ¶ 28.)

Plaintiff asserts that at some unspecified time, he told Defendant Igwe he was experiencing "unbearable" stomach pain and pain in his body and that he had previously been prescribed Excedrin, but Defendant Igwe "constantly removed/discontinued" the prescription and has refused to provide Plaintiff with adequate pain management medication.  (Doc. 116 at 11.)  Plaintiff also states that in February, April, June, and July 2019, Plaintiff requested pain management medication from Defendant Igwe, and Defendant Igwe prescribed alpha lipoic acid, even though she knew that does not relieve Plaintiff's pain.  (*Id.*)  But Plaintiff's medical records show that on various occasions during her treatment of Plaintiff, Defendant Igwe prescribed pain management medications including Excedrin, Ibuprofen, a cortisone injection, and a Ketorolac injection.  (Doc. 153 ¶¶ 61, 72, 75; Doc. 165 ¶ 20.)

Plaintiff also contends that "[o]n many occasions[,]" he told Defendant Igwe "that two cysts in [his] scrotum are causing [him] pain that is unbearable" and that Defendant Igwe told him "that monitoring is sufficient treatment" and that she could not do anything except order an ultrasound.  (Doc. 116 at 12, 17–18.)  But again, Plaintiff's statements are

contradicted by his medical records which show that Defendant Igwe consistently responded to his complaints regarding his scrotal cyst including ordering an ultrasound, urinalysis and urine cultures (which were negative), and referring him to a urologist. Plaintiff may have preferred a biopsy or to have the cyst surgically removed, but his mere disagreement with Defendant Igwe's chosen treatment plan does not support an Eighth Amendment claim, especially where the record shows that Defendant Igwe made such determinations based on her medial training and professional judgment. *Sanchez*, 891 F.2d at 242.

On these facts, Defendants have met their burden at summary judgment of showing that Defendant Igwe responded appropriately to Plaintiff's serious medical needs. Plaintiff's medical records show that Defendant Igwe consistently examined him in response to his medical complaints, monitored his conditions, ordered appropriate testing when necessary, forwarded Plaintiff's results to the Hepatitis C Committee, reviewed the results with Plaintiff, and prescribed medication when necessary. Plaintiff's statements in the Second Amended Complaint fail to refute the ample evidence in his medical records that shows Defendant Igwe's responses to his medical complaints and to his serious medical needs were based on her judgment and training and not made with deliberate indifference.

Accordingly, Plaintiff's medical care claims against Defendant Igwe will be dismissed.

### c.    Defendant Corizon

The facts do not show that Plaintiff suffered a constitutional violation with respect to his scrotal cyst while under Corizon's care. The available evidence shows that Corizon providers closely monitored the cyst on Plaintiff's scrotum. Plaintiff underwent an ultrasound in February 2018, which showed epididymal cyst but no torsion or epididymitis. Plaintiff's medical records show that the cyst remained small and did not grow significantly. Conservative management was initially chosen as the course of treatment, and Plaintiff's providers continued to note that there was no bleeding, rash, drainage,

1  swelling, edema, or discharge.  Based on their assessments, Plaintiff's providers
2  determined that there was no indication that the cyst was infected or that a biopsy was
3  medically necessary.  On these facts, the record does not support a finding that the
4  Corizon's staff's treatment of Plaintiff's scrotal cyst amounted to deliberate indifference.

5        On the other hand, construing the facts in Plaintiff's favor, the record contains
6  sufficient evidence to create a genuine issue of material fact that Plaintiff suffered a
7  constitutional deprivation with respect to his Hepatitis C care under Corizon.  Despite
8  having a standard of care under which prisoners with APRI scores of 2.0 or greater are
9  given top priority for Hepatitis C treatment, it does not appear that Plaintiff was considered
10  for treatment when his APRI score was 2.329 on December 15, 2017 or when his APRI
11  score was 2.338 on September 12, 2018 according to one of two lab tests.  (Doc. 153 ¶¶
12  10, 44.)  Under the BOP Manual and under the ADC's Clinical Practice Guidelines,
13  patients with APRI score of 2.0 or greater are prioritized for treatment.  Yet, in Plaintiff's
14  case, there is no evidence that he was prioritized for treatment when his APRI score rose
15  above 2.0 in December 2017 and in September 2018, even though Plaintiff made multiple
16  requests for treatment during that time.  There is also no evidence that Corizon developed
17  a treatment plan for Plaintiff or took any actions to prepare him for treatment when his
18  APRI score placed him in the top priority for treatment.  On this record, a reasonable jury
19  could conclude that Corizon showed deliberate indifference to Plaintiff's serious medical
20  needs.

21        There are also genuine issues of material fact whether Plaintiff experienced harm as
22  a result of this indifference, where he made multiple complaints of abdominal and body
23  pain and bloody stools.  Even if there is no objective data of worsening health or liver
24  inflammation due to Hepatitis C, Plaintiff is competent to describe his own symptoms.  *See*
25  Fed. R. Civ. P. 56(c)(4); *S. Cal. Housing Rights Ctr. v. Los Feliz Towers Homeowners*
26  *Ass'n*, 426 F. Supp. 2d 1061, 1070 (C.D. Cal. 2005) (declarant has personal knowledge of
27  her own symptoms); *see also Thomas v. Garcia*, 1:08-cv-00689-JLT (PC), 2013 WL
28  3773861, at *11 (E.D. Cal. July 17, 2013) (a party may testify as to what he felt when

injured, how the injury affects him now and impacts his life, and any other information within his own personal knowledge based upon his own perceptions).  A reasonable jury could infer from Plaintiff's abdominal pain and other symptoms that occurred in conjunction with his elevated APRI score that these symptoms resulted from the progression of his Hepatitis while Corizon continued to deny treatment.  On this record, there are genuine issues of material fact whether Plaintiff suffered a constitutional deprivation while under Corizon's care.

In addition to showing a constitutional deprivation, Plaintiff must be able to show that Corizon had a policy or custom, the policy or custom was deliberately indifferent to his serious medical needs, and the deliberately indifferent policy or custom was the "moving force" behind the constitutional deprivation.  *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

Here, it is undisputed that Corizon had specific, established policies for monitoring, assessing, and prioritizing treatment for prisoners with Hepatitis C.  The relevant analysis therefore hinges on whether these policies were deliberately indifferent to Plaintiff's serious medical needs and were the "moving force" behind Plaintiff's asserted injuries.

Defendants have presented evidence Corizon's Hepatitis treatment policies are based on parameters published by the BOP, ratified by ADC, and supported by third-party research.  Defendants point to the Gilead Report's recognition that Medicaid providers also use parameters such as fibrosis levels to assess treatment eligibility.  The undisputed evidence also shows that Hepatitis C is a slowly progressing disease and that progression from Hepatitis C infection to fibrosis and eventually cirrhosis may take years in some patients, decades in others, or may not occur at all.  Incarcerated individuals are also thirteen times more likely to test positive for Hepatitis C, and according to the ADC Guidelines, 23% of ADC prisoners are infected with Hepatitis C.  Under these facts, monitoring Hepatitis C-infected prisoners for indications that the disease is progressing or has developed to a point that puts them at risk of serious liver damage before instituting drug therapies is reasonable, and Defendants have met their initial burden of showing that

Corizon's Hepatitis C treatment policies within ADC were not deliberately indifferent. Moreover, under these circumstances, Plaintiff's desire for earlier or automatic Hepatitis C treatment in lieu of regular lab tests and monitoring represents only a difference of opinion as to the appropriate plan of care, which is insufficient to show that Corizon's Hepatitis C treatment policies were deliberately indifferent.

Because Plaintiff cannot show that Corizon implemented or observed policies or regular practices that were deliberately indifferent or that any such policies or practices were the moving force behind Plaintiff's asserted injuries, Plaintiff's *Monell* liability claim against Corizon fails as a matter of law, and the Court will grant summary judgment to Corizon and dismiss it from this action with prejudice.

Moreover, even if Plaintiff could show that Corizon's Hepatitis C treatment policies were deliberately indifferent, the record evidence does not support that these policies were the "moving force" behind Plaintiff's asserted injuries.  At most, the evidence shows that Plaintiff suffered various indeterminate symptoms, including abdominal pain and bloody stools, during times when his APRI score was greater than 2.0, and during which Plaintiff remained in Corizon's care without Hepatitis C treatment.  But any injuries Plaintiff may have suffered from not being prioritized for Hepatitis C treatment when his APRI score prioritized him for treatment can only be attributed to the apparent failure of medical staff to follow the relevant policies.  Such failures, whether due to inadvertence or deliberate indifference, cannot support a *Monell* liability claim where the failure to prioritize Plaintiff for more immediate treatment cannot be attributed to Corizon's policies and there is no evidence that Corizon had a widespread practice or custom of ignoring elevated fibrosis levels.

Because Plaintiff cannot show that Corizon implemented or observed policies or regular practices that were deliberately indifferent or that any such policies or practices were the moving force behind Plaintiff's asserted injuries, Plaintiff's *Monell* liability claims in Counts 1 and 2 against Corizon fail as a matter of law, and the Court will dismiss those claims.

1    **d.    Defendant Centurion**

2          The available record does not support a deliberate indifference claim against

3    Centurion with respect to Plaintiff's scrotal cyst.  The facts show that after he came under

4    Centurion's care, Plaintiff underwent another ultrasound in August 2019 and was assessed

5    multiple bilateral epididymal cysts, but no sign of torsion or testicular mass.

6          Centurion also sent Plaintiff to an off-site consultation with a urologist in January

7    2020, and the urologist recommended that Plaintiff undergo a spermatocelectomy in order

8    to remove sperm-filled cysts inside his scrotum.   Centurion approved the surgical

9    procedure and Plaintiff underwent the spermatocelectomy in 2020 and attended a post-

10   operative urology consult in July 2020.  These facts do not show that the Centurion staff's

11   treatment of Plaintiff's scrotal cyst amounted to deliberate indifference.

12         Moreover, the facts also do not support that Plaintiff suffered a constitutional

13   violation while under Centurion's care regarding his Hepatitis C or that Centurion

14   maintained policies regarding Hepatitis C treatment that denied Plaintiff appropriate

15   medical care.

16         When Centurion assumed responsibility for prisoner healthcare within ADC,

17   Centurion implemented standard Hepatitis C treatment guidelines, which focused on

18   prisoners' fibrosis scores and consultation with a Hepatitis C specialist.  The evidence also

19   shows that during the time Plaintiff has been under Centurion's care, his records indicate

20   that he did not meet the criteria for Hepatitis C treatment.  Plaintiff's December 2019

21   Fibrotest/Actitest showed he had scores of F1 and F2, indicating minimal fibrosis, and his

22   APRI score was 0.762.  For these reasons, and the fact that he had no indication of cirrhosis

23   or co-infections—Plaintiff was placed in a lower priority level.  These facts are sufficient

24   to show that Plaintiff has not suffered a constitutional deprivation with regard to his

25   Hepatitis C while under Centurion's care.  Instead, his Hepatitis C continued to be

26   monitored through regular chronic care visits and laboratory tests, and his APRI and

27   fibrosis levels remained low.

28         Plaintiff did not refute Defendants' evidence or present any additional facts or

evidence that would create a genuine issue of material fact that he suffered a constitutional deprivation under Centurion's care.  Absent a showing of a constitutional deprivation, the Court need not address the remaining *Monell* factors regarding the Hepatitis C treatment he received while under Centurion's care.

Based on the foregoing, Plaintiff's *Monell* liability claims in Counts 1 and 2 against Centurion fail as a matter of law, and the Court will dismiss those claims.

### 2.   "Centralized Coordination" Policy Claim (Count 3)

In Count 3, Plaintiff asserts that Defendants Corizon and Centurion have deliberately chosen a policy of not centrally coordinating medical services for prisoners. (Doc. 116 at 20.)  Plaintiff states that he has received care from multiple providers, but under Corizon and Centurion's policies, none of the providers "were responsible for coordinating his overall care." (*Id.* at 20.)  Plaintiff asserts that he has "yet to arrive at a unit where the health care provider has [his] medical file in front of [the provider]" to review "pas[t] information from previous health care providers" and to "understand the clear scope of the individual currently before [the provider]." (*Id.* at 21.)

As previously stated, to succeed on an Eighth Amendment policy claim against Corizon and Centurion, Plaintiff must show that Defendants Shinn, Corizon, and Centurion promulgated policies or customs that amounted to deliberate indifference and that were the moving force behind a violation of Plaintiff's constitutional rights.  *Monell*, 436 U.S. at 690-94.

As an initial matter, although the Court ordered Defendant Shinn to answer Count 3 of the Second Amended Complaint (*see* Doc. 117 at 6), Plaintiff does not make any allegations against Defendant Shinn regarding his "centralized coordination" policy claim in Count 3.  (*See* Doc. 116 at 20–23.)  Accordingly, Defendant Shinn will be dismissed from this portion of Count 3.  *See* 8 U.S.C. § 1915(e)(2)(B).

Moreover, the available evidence does not show that Corizon and Centurion have implemented a policy of failing to centrally coordinate prisoners' medical records.  Instead, the evidence shows that each time Plaintiff was transferred between ADC facilities, his

medical files and medications were transferred with him and were used by the medical staff at the new facilities to continue Plaintiff's medical treatment. (Doc. 153 ¶¶ 2–3, 5, 47; Doc. 154-1 at 9, 18–23, 25–30, 34–38.) These facts do not suggest that Centurion and Corizon had a policy or custom of not centralizing or coordinating medical records or services. The record also does not show that Centurion and Corizon's medical coordination policies led to a violation of Plaintiff's constitutional rights where the evidence indicates that the medical staff at each ADC facility had access to Plaintiff's medical files and were able to access these files during Plaintiff's various appointments. Plaintiff's assertion that he had "yet to arrive at a unit where the provider had access" to his medical files is clearly contradicted by the evidence that shows his medical chart and continuity-of-care information was available to, and used by, the medical staff and providers throughout his many healthcare encounters at various ADC facilities. Even if Plaintiff encountered providers who did not have his records "in front of" them, there are no facts in the record to suggest that this occurred as a result of a Corizon or Centurion policy or custom.

Accordingly, Plaintiff's claim in Count 3 regarding Corizon and Centurion's failure to centrally coordinate medical services will be dismissed.

### 3. Covid-19 Claim (Count 5)

Defendant Shinn did not file a dispositive motion regarding Plaintiff's claim in Count 5. The Court will give Defendant Shinn additional time to file a dispositive motion limited to this claim.

## V. Access-to-Courts Claim (Counts 3 and 4)

In Count 3, Plaintiff asserts that Defendants Corizon, Centurion, Igwe, Stewart, Pontious, Perkins, Randall, and Raney have "impeded and delayed [his] ability to have meaningful access to the courts." (Doc. 116 at 23.) Plaintiff states that former ADC Director Ryan "changed ADC policy to give Corizon and Centurion the exclusive authority over the medical grievance process" and that they have removed the ability to appeal which has "rendere[ed] the grievance process unavailable." (*Id.*)

1    In Count 4, Plaintiff alleges that the "ADC has no law libraries and the paralegal is

2    not allowed to assist inmates, except to p[er]form the function of reviewing documents."

3    (Doc. 116-1 at 2.)   Plaintiff claims that he ordered a book titled, "An Inexplicable

4    Deformity," "which discusses ADC and Corizon and cases that may be helpful."  (*Id.*)

5    Plaintiff claims that on September 25, 2019, former Defendants Williams and Miller told

6    him he could not have the book pursuant to ADC policy because the book "discusses cases

7    that names [ADC] employee's [sic]."  (*Id.*)

8    **A.    Legal Standard**

9    The right of meaningful access to the courts prohibits officials from actively

10   interfering with inmates' attempts to prepare or file legal documents.  *Lewis v. Casey*, 518

11   U.S. 343, 350 (1996).  The right of access to the courts is only a right to bring petitions or

12   complaints to federal court and not a right to discover such claims or even to ligate them

13   effectively once filed with a court.   *Id.* at 354.   The right "guarantees no particular

14   methodology but rather the conferral of a capability–the capability of bringing

15   contemplated challenges to sentences or conditions of confinement before the courts." *Id*.

16   at 356.

17   As a matter of standing, for an access-to-courts claim, a plaintiff must show that he

18   suffered an "actual injury" with respect to contemplated litigation.  *Id*. at 349.  To show

19   actual injury with respect to contemplated litigation, the plaintiff must demonstrate that the

20   defendants' conduct frustrated or impeded him from bringing to court a nonfrivolous claim

21   that he wished to present.  *Id*. at 352-53.

22   "[T]he injury requirement is not satisfied by just any type of frustrated legal claim."

23   *Id*. at 354.  The right of access to the courts "does not guarantee inmates the wherewithal

24   to transform themselves into litigating engines capable of filing everything from

25   shareholder derivative actions to slip-and-fall claims."  *Id*. at 355.  The nonfrivolous claim

26   must be a direct or collateral attack on the inmate's sentence or a challenge to the conditions

27   of his confinement.  *Id*.  "Impairment of any *other* litigating capacity is simply one of the

28

incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.* (emphasis in original).

**B.     Discussion**

On this record, there is no evidence that Plaintiff suffered an "actual injury" to support an access-to-courts claim.   The record shows that Plaintiff had access to the prisoner administrative grievance process through filing inmate letters and grievances. Moreover, Plaintiff has failed to specify a nonfrivolous claim that Defendants have hindered him from pursuing.   With respect to Plaintiff's claim in Count 3, he vaguely asserts that Defendants Corizon, Centurion, Igwe, Stewart, Pontious, Perkins, Randall, and Raney "impeded and delayed" his meaningful access to the courts without providing specific examples of how they did so.  (*See* Doc. 116 at 23.)   Likewise, in Count 4, Plaintiff states in conclusory fashion that he ordered a book "that may have been helpful" but was denied the book pursuant to ADC policy.  (Doc. 116-1 at 2.)   However, Plaintiff does not specify how the book would have helped him, what case it would have helped him with, or the nonfrivolous claim he was prevented or hindered in pursuing as a result of not having access to the book.  Plaintiff has not presented any evidence to defeat summary judgment, and the vague assertions in his Second Amended Complaint are insufficient to establish standing in an access-to-court claim.   Additionally, the denial of access to a paralegal or use of a law library is not actionable if there is no claim of prejudice to an existing or future legal action. *Lewis*, 518 U.S. at 351-53.  Therefore, Plaintiff's statement regarding the lack of a law library and the inadequacy of the prison paralegal is insufficient to create a triable issue of fact on his access-to-court claim.

Accordingly, Plaintiff's access-to-courts claims in Counts 3 and 4 will be dismissed.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is withdrawn as to Defendants' Motions for Summary Judgment (Doc. 152, 161, 164), Defendants' Motion for Ruling (Doc. 214), and Plaintiff's Motions to Disqualify Counsel (Docs. 215, 217).

(2)     Defendants' Motion for Ruling (Doc. 214) is **denied**.

(3)     Plaintiff's Motions to Disqualify Counsel (Docs. 215, 217) are **denied**.

(4)     Defendants' Motions for Summary Judgment (Doc. 152, 161, 164) are **granted**.

(5)     Counts 1, 2, 3, and 4 of the Second Amended Complaint are **dismissed with prejudice**.

(6)     Defendants Corizon, Centurion, Igwe, Stewart, Perkins, Robertson, Headstream, Pontious, Randall, and Raney are **dismissed with prejudice**.

(7)     The only claim remaining in this action is Plaintiff's claim against Defendant Shinn in Count 5 regarding Covid-19 protocols.

(8)     Defendant Shinn may file a motion for summary judgment limited to Plaintiff's sole remaining claim in Count 5 within **30 days** of this Order.

Dated this 16th day of September, 2021.

Michael T. Liburdi
United States District Judge