WO                                                                                                    SH

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christopher James Henson, | No. CV 19-04396-PHX-MTL (DMF) |
| Plaintiff, | |
| v. | **ORDER** |
| Corizon Health LLC, et al., | |
| Defendants. | |

Plaintiff Christopher James Henson, who is currently confined in Arizona State Prison Complex (ASPC)-Florence, East Unit, brought this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 116.) Defendant Shinn moves for summary judgment. (Doc. 231.) Although Plaintiff was informed of his right and obligation to respond to Defendant's Motion for Summary Judgment, Plaintiff did not respond, and the time to do so has expired.[1]

**I.  Background**

On screening of Plaintiff's Second Amended Complaint (Doc. 116) pursuant to 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated constitutional claims against Defendants Arizona Department of Corrections (ADC) Director David Shinn (in his official capacity only), Corizon Health, Centurion of Arizona, Nurse Practitioner Dorothy Igwe, Contracting Monitoring Bureau Director David Robertson, Supervisor Vanessa

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response. (Doc. 233.)

Headstream, Dr. Rodney Stewart, Medical Director Thomas Lutz, Facility Health Administrators Adam Perkins and Trina Randall, Nursing Supervisors Elizabeth Pontious and Phyllis Raney, and ADC Office of Publication Review employees Tray Williams and Diane Miller and ordered them to respond to the respective claims against them. (Docs. 70, 117.) The Court subsequently dismissed Defendants Williams and Miller pursuant to Federal Rule of Civil Procedure 12(c). (Doc. 162.) The Court also dismissed Defendant Lutz for failure to timely serve. (Doc. 179.)

On September 16, 2021, the Court granted summary judgment to Defendants Corizon, Centurion, Igwe, Stewart, Perkins, Robertson, Headstream, Pontious, Randall, and Raney and dismissed them from the action with prejudice. (Doc. 225.)

Plaintiff's sole remaining claim is Count 5 in which he alleges that Defendant Shinn violated his Eighth Amendment rights by failing to implement proper cleaning and screening policies to protect him and other prisoners from Covid-19. Defendant Shinn now moves for summary judgment as to Plaintiff's claim regarding ADC's Covid-19 protocols. (Doc. 231.)

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III.  Exhaustion

Defendant Shinn first argues that Plaintiff did not exhaust the available administrative remedy with respect to his claim regarding ADC's Covid-19 protocols.

####  A.   Exhaustion Standard

Under the Prison Litigation Reform Act, a prisoner must exhaust "available" administrative remedies before filing an action in federal court. *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005). The prisoner must complete the administrative review process in accordance with the applicable rules. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process). Once that

showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. The ultimate burden, however, rests with the defendant. *Id.* Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust. *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

If summary judgment is denied, disputed factual questions relevant to exhaustion should be decided by the judge; a plaintiff is not entitled to a jury trial on the issue of exhaustion. *Albino*, 747 F.3d at 1170-71. But if a court finds that the prisoner exhausted administrative remedies, that administrative remedies were not available, or that the failure to exhaust administrative remedies should be excused, the case proceeds to the merits. *Id.* at 1171.

### B.    Discussion

In the "Administrative Remedies" section of his Second Amended Complaint, Plaintiff did not check any of the boxes indicating whether he had exhausted his claim against Defendant Shinn. (Doc. 116-1 at 4.) Instead, Plaintiff asserted that there were "[n]o available remedies within the meaning of [the] PLRA, [Corrections Officer] CO IV Bohuszewics destroy[]s all inmate grievance documents as a matter of ADOC practice and Director refuses to address it." (*Id.*)

Defendant Shinn argues that the administrative grievance process was available to Plaintiff as evidenced by his exhaustion of his claims in Counts 1–4 of the Second Amended Complaint. (Doc. 231 at 8.) Defendant did not provide a copy of the ADC grievance procedure as an exhibit and instead included a link to the grievance procedure. (Doc. 231 at n.1.) However, the destination for the link Defendant provided is no longer available, and the current version of the ADC grievance procedure was not in effect at the time Plaintiff's claim against Defendant Shinn arose.[2] Defendant has not presented any

---

[2] *See* ADC Department Order 802, Inmate Grievance Procedure (effective March 2,

other evidence regarding the ADC administrative remedy process or Plaintiff's ADC grievance history. Moreover, Plaintiff's ability to exhaust some of his claims does not mean that CO IV Bohuszewics did not hinder or thwart Plaintiff's ability to exhaust his claim against Defendant Shinn. *See e.g., McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015) (threat of retaliation can render grievance process effectively unavailable and excuse a prisoner's failure to exhaust); *Nunez v. Duncan*, 591 F.3d 1217, 1224– 26 (9th Cir. 2010) (warden's mistake rendered administrative remedies " effectively unavailable"); *Marella v. Terhune*, 568 F.3d 1024, 1027– 28 (9th Cir. 2009) (per curiam) (remedies unavailable if prisoner does not have access to the necessary grievance forms).

As such, Defendant has not met his initial burden at summary judgment of showing there was an administrative remedy available to Plaintiff and that Plaintiff did not exhaust the administrative remedy process. *See Albino*, 747 F.3d at 1169, 1172 (defendant bears the initial burden of showing that there was an available administrative remedy). Accordingly, Defendant's Motion for Summary Judgment will be denied as to the issue of exhaustion, and the Court will move on to the merits of Plaintiff's claim.

## IV.  Medical Claim

In his remaining claim, Plaintiff asserts that his asthma and Hepatitis C put him at increased risk of contracting the Covid-19 virus, and Defendant Shinn has failed in his duties as ADC Director to implement proper cleaning and screening policies to protect Plaintiff and other prisoners from the disease.

### A.  Legal Standard

To support a § 1983 medical claim, a plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain and (2) the defendant's response was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). To act with deliberate indifference, a prison official must both

---

2022), https://corrections.az.gov/sites/default/files/policies/800/0802.pdf (last visited Mar. 17, 2022).

- 5 -

know of and disregard an excessive risk to inmate health; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. *Jett*, 439 F.3d at 1096. Deliberate indifference may also be shown when a prison official intentionally denies, delays, or interferes with medical treatment or by the way prison doctors respond to the prisoner's medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Jett*, 439 F.3d at 1096.

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. Cal. Dep't of Corrs.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

Moreover, to prove a claim under § 1983 against Defendant Shinn in his official capacity, Plaintiff must satisfy the test articulated in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690-94 (1978), by presenting facts to support that his constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138-39 (9th Cir. 2012). In this case, Plaintiff must show: (1) a constitutional violation; (2) that Defendant Shinn implemented a policy or custom that amounted to

deliberate indifference; and (3) that the policies or customs were the moving force behind the violation of Plaintiff's constitutional rights in the sense that Defendant Shinn could have prevented the violation with an appropriate policy. *See Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1193-94 (9th Cir. 2002).

### B.   Relevant Facts[3]

On March 13, 2020, in response to the expectation of additional cases of the Covid-19 virus within the civilian population of Arizona, ADC suspended visitation at all Arizona prison complexes for 30 days subject to re-evaluation at that time in order to mitigate the potential introduction and spread of the virus within the prison system and its impact on staff and prisoners, as well as to ensure the continued effective operation of the state correctional system, and to be proactive. (Doc. 232 (Def.'s Statement of Facts) ¶ 1.) As of that date, ADC did not have any confirmed Covid-19 cases. (*Id.*)

During the visitation suspension period, ADC allowed prisoners two 15-minute phone calls per week free of charge. (*Id.* ¶ 2.) ADC also continued to inform both staff and prisoners about how they could reduce the risk of contracting the virus by washing hands, sanitizing surfaces, covering coughs and sneezes and encouraging employees to stay home if they were sick. (*Id.*)

On March 18, 2020, consistent with CDC guidelines, ADC waived the $4.00 co-pay for health care services for prisoners experiencing flu or cold-like symptoms and provided free hand soap to all prisoners upon request as recommended by the Arizona Department of Health Services (ADHS). (*Id.* ¶ 4.) ADC also stopped all routine internal movement of prisoners across all prison complexes, suspended all classes provided by local community colleges, initiated a weekly deep cleaning of all facilities, and increased the

---

[3] Because Plaintiff failed to file a response or controverting statement of facts, the Court will consider Defendant's facts undisputed unless they are clearly controverted by Plaintiff's first-hand allegations in the verified Second Amended Complaint or other evidence in the record. Where the nonmovant is a pro se litigant, the Court must consider as evidence in opposition to summary judgment all the nonmovant's contentions set forth in a verified complaint or motion. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

availability of soap, paper towels, hygiene items and cleaning agents for both prisoners and staff. (*Id.*)

ADC also required all employees entering a prison complex to undergo an Infectious Disease Symptoms Check including a series of health questions. (*Id.* ¶ 5.) In conjunction with ADC's prisoner healthcare vendor, Centurion, ADC staff were checked for symptoms of the virus continuously as they entered each facility. (*Id.*) Prisoner work crews were screened as they departed and re-entered all prison complex facilities. (*Id.*)

As of March 20, 2020, ADC had no known cases of the virus and continued to follow the mandatory industry standards set forth by the American Correctional Association and the guidelines of the National Commission of Correctional Health Care. (*Id.* ¶ 6.) Centurion continued to work to ensure it followed the established guidance of the CDC and public health officials, including ADHS, as well as providing training to staff, updated information, and adopting other additional precautions as necessary. (*Id.*)

On March 23, 2020, ADC had no confirmed cases of the virus. (*Id.* ¶ 7.) Six prisoners were tested for the virus with the results still pending while they were being monitored and cared for in a separate area to reduce the risk of transmission. (*Id.*) By that date, ADC had significantly reduced the number and frequency of prisoner work crews and required temperature checks upon return to the prison complexes. (*Id.*)

By March 25, ADC pulled back all off-site work crews until such time as the national and local public health experts considered the virus no longer a threat. (*Id.* ¶ 8.) In March 2020, ADC reached a collective agreement with sheriffs in all 15 Arizona counties to temporarily suspend admissions of convicted persons from county jails for 21 days, followed by subsequent 21-day cycles of prudent admissions. (*Id.* ¶ 9.) As of March 30, 2020, there were no known virus cases at any of ADC's prison complexes. (*Id.*)

By April 1, 2020, there were no known cases of the virus in ADC; 34 prisoners had been tested for the virus, 29 were negative, and 5 test results were pending. (*Id.* ¶ 10.) In April 2020, there were limited personal protective equipment ("PPE") supplies across the country for law enforcement, first responders, and healthcare providers. (*Id.* ¶ 11.) At this

point in the pandemic, ADC continued to focus on presentation of symptoms which had been effective in managing the situation to this point. (*Id.*) According to CDC recommendations at the time, masks should be worn by patients with active virus symptoms during transportation to monitoring sites and by those providers at healthcare facilities directly treating those patients. (*Id.*) As the situation dictated, PPE was available for all employees to appropriately respond. (*Id.*) This procedure and protocol matched ADC's direction for meeting all infectious disease threats encountered in the correctional environment. (*Id.*) The best advice by the CDC and ADHS was to wash hands frequently and wipe down common areas with properly mixed disinfectant spray. (*Id.*) As CDC guidelines changed, ADC adapted its procedures to meet the new directives. (*Id.*) During this time period, ADC was actively engaged in finalizing measures to strategically control admissions to the entire state correctional system. (*Id.*)

By April 3, 2020, to promptly implement the most recent CDC guidance, ADC recommended employees wear a non-medical (non-PPE) cloth face covering to reduce the risk of transmission of the virus while conducting essential business. (*Id.* ¶ 12.) This recommendation included employees reporting for duty across ADC. (*Id.*) Additionally, ADC continued to follow the recommendations by the CDC regarding PPE for incarcerated/detained individuals and staff in a correctional facility. (*Id.*) ADC continued to provide medical masks for healthcare workers and employees in direct contact with individuals who exhibited active flu-like or Covid-19 symptoms. (*Id.*) ADC also continued to separate any prisoner who was exhibiting flu-like symptoms from the general population for monitoring and appropriate follow-up care. (*Id.*)

By April 7, 2020, as part of ADC's response to the evolving CDC guidelines regarding face coverings, ADC began distributing fabric face coverings to all employees. (*Id.* ¶ 13.) The CDC recommended that essential staff wear non-medical (non-PPE) cloth face coverings to reduce the risk of transmission of the virus. (*Id.*)

On April 7, 2020, ADC was notified that two prisoners had tested positive for the virus. (*Id.* ¶ 14.) The first prisoner had been housed at a community hospital since March

27, 2020 due to other non-virus related symptoms. (*Id.*) The prisoner was found positive for Covid-19 after having been previously tested twice with negative results at the same community hospital. (*Id.*) ADC was also notified of a prisoner who tested positive for the virus at the Marana Community Correctional Treatment Facility operated by Management and Training Corporation. (*Id.*) As of that date, 60 prisoners had been tested, 48 had tested negative, 10 were pending, and 2 tested positive. (*Id.*) Consistent with CDC guidance and ADC Infectious Disease Protocols, ADC continued to separate any prisoners who exhibited flu-like symptoms from the general population, for monitoring and appropriate follow-up care. (*Id.*)

On April 9, 2020, ADC was notified that a prisoner had tested positive for the virus at ASPC-Florence. (*Id.* ¶ 15.) As of that date, 68 prisoners had been tested, 58 had tested negative, 3 were confirmed positive, and 7 were pending. (*Id.*)

On May 28, 2020, ADC announced the start of enhanced Covid-19 testing at ASPC-Yuma for all correctional officers and prison employees. (*Id.* ¶ 16.)

On June 12, 2020, ADC commenced enhanced virus testing at ASPC-Florence as part of a statewide plan to provide testing to all correctional officers and prison employees. (*Id.* ¶ 17.) All prison complex staff members were required to wear cloth face coverings beginning June 15, 2020. (*Id.*)

By July 2, 2020, ADC had distributed fabric face coverings to all prisoners for their use. (*Id.* ¶ 18.) This included ADC's third-party operated prison complexes and prisoners arriving at ADC's intake facility in Phoenix. (*Id.*)

On August 4, 2020, 517 prisoners housed at the ASPC-Tucson, Whetstone Unit tested positive for the virus. (*Id.* ¶ 19.) Prisoners who tested positive were housed as a cohort together in separate areas and received appropriate medical care. (*Id.*) They were not allowed back into the general population until they were medically cleared. (*Id.*) In addition to measures that were already in place, all prisoners at the Whetstone Unit received meals, all required medications, and medical services in their housing units. (*Id.*) All ADC

prison staff were required to wear cloth face coverings since June 15, 2020, and suspended visitation was continued through November 2020.  (*Id.*)

On December 8, 2020, testing was conducted at the ASPC-Florence, Globe Unit and the ASPC-Yuma, La Paz Unit, with 655 of those tests at La Paz coming back positive.  (*Id.* ¶ 20.)  The testing of the populations at these units allowed ADC to swiftly cohort, compartmentalize, and provide medical care.  (*Id.*)  The La Paz Unit housed a total of 1,066 prisoners.  (*Id.*)  Each prison facility had an onsite survey completed by the ADHS Infection Control Assessment and Response team which continued to be available to offer assistance.  (*Id.*)  Prisoners who tested positive were housed separately from the rest of the unit.  (*Id.*)

Comprehensive prisoner services, including meals, required medications, and medical services were brought directly to the infected prisoners' housing location.  (*Id.*)  They were not allowed back into the general population until they were medically cleared.  (*Id.*)  Per CDC guidance for correctional facilities, all ADC prisoners were provided face coverings.  (*Id.*)  Prisoners were required to wear their face coverings upon leaving their immediate living area.  (*Id.*)  All prison complex staff was also required to wear cloth face coverings.  (*Id.*)

By December 2020, ADC was preparing for the approval and distribution of a Covid-19 vaccine.  (*Id.* ¶ 21.)  The health care professionals who provide medical services to ADC's prisoner population were in the process of being certified to administer Covid-19 vaccines as soon as supplies were available.  (*Id.*)  All employees entering any ADC prison complex continued to undergo required temperature and symptom checks.  (*Id.*)  All incoming admissions were tested at intake facilities such as ASPC-Phoenix, where ADC receives new prisoners admissions from the county jails and where the new prisoners are cohorted and monitored for 14 days prior to intra-system movement.  (*Id.*)

ADC, in collaboration with ADHS, conducted onsite PCR testing of prisoners at all of its statewide facilities.  (*Id.* ¶ 23.)  ADC continued to isolate and test prisoners with flu-like symptoms and continued to re-test as needed.  (*Id.*)  If necessary, prisoners were transported to the hospital if they required higher levels of care.  (*Id.*)

Between March and late December 2020, ADC received more than 6,850 intakes from Arizona's 15 counties. (*Id.* ¶ 24.) To accommodate the influx of new admissions and to maintain the health and safety of the existing prisoner population, ADC opened additional intake centers at the ASPC-Lewis, Morey Unit and the ASPC-Tucson, Rincon Unit. (*Id.*) These additional intake centers allowed ADC to isolate incoming prisoners who tested positive for the virus so that they could receive appropriate care and medical clearance before entering the general population. (*Id.*)

During this same time period, more than 85,000 tests were conducted at ADC prison complexes and contract prison facilities. (*Id.* ¶ 25.) The second round of prisoner testing began in January 2021 in collaboration with ADHS, and rapid testing for staff was deployed on an as-needed basis. (*Id.*) ADHS provided ADC with 4,000 BinaxNOW™ COVID-19 Card Rapid Antigen tests produced by Abbott. (*Id.*)

In August 2020, ADC became one of only a handful of state correctional agencies in the nation to mass test its entire prisoner population. (*Id.*) Mass testing allowed ADC to identify asymptomatic spread and then isolate and group prisoners as needed to mitigate Covid-19 spread in its facilities. (*Id.*) Each test was then recorded in the prisoner's medical record. (*Id.*)

In January 2021, Covid-19 vaccinations began at ASPC-Perryville for correctional officers who were part of the 1B protective services personnel group. (*Id.* ¶ 26.) The officers began receiving the Moderna Covid-19 vaccination on a voluntary basis. (*Id.*) The next week, vaccinations were provided at Perryville for Centurion healthcare workers who were part of the 1A frontline healthcare group. (*Id.*) As ADC acquired additional vaccines, distribution expanded to the same groups at other complexes. (*Id.*)

Also in January 2021, ADC began offering a second round of PCR testing to its prisoner population. (*Id.*) This testing was conducted in collaboration with ADHS at all 10 ADC complexes as well as at ADC's private prison facilities. (*Id.*) As ADC acquired additional vaccines, distribution expanded to the same groups of employees at other complexes. (*Id.*)

In March 2021, ADC began offering Covid-19 vaccines to prisoners at its 10 state complexes as well as private prison facilities. (*Id.* ¶ 27.) As of March 2021, ADC had received 3,940 doses from ADHS and had administered 3,337 total vaccines. (*Id.*) Additionally, the private prisons had administered 1,034 vaccines. (*Id.*) At that time, ADC had a prisoner population of 36,768. (*Id.*) ADC offered the vaccines as they were allocated to the Department. (*Id.*)

By early April 2021, ADC had received 6,540 doses from ADHS and had administered 5,499 vaccines. (*Id.* ¶ 28.) Additionally, the private prisons had administered 1,361 vaccines. (*Id.*) By April 9, 2021, ADC had received 11,690 doses from ADHS and had administered 10,091 vaccines. (*Id.*) The private prisons had administered 1,964 vaccines. (*Id.*)

By April 16, 2021, ADC had received 19,980 doses from ADHS and had administered 13,903 vaccines. (*Id.*) The private prisons had administered 4,233 vaccines. (*Id.*)

By April 23, 2021, ADC had received 27,980 doses from ADHS and administered 21,193 vaccines. (*Id.* ¶ 29.) The private prisons had administered 4,511 vaccines. (*Id.*)

By April 30, 2021, ADC had received 31,180 doses from ADHS and administered 22,575 vaccines. (*Id.*) The private prisons had administered 5,079 vaccines. (*Id.*)

By May 7, 2021, ADC had received 31,580 doses from ADHS and had administered 22,795 vaccines. (*Id.*) The private prisons had administered 5,179 vaccines. (*Id.*)

By May 14, 2021, ADC had received 43,580 doses from ADHS and had administered 36,494 vaccines. (*Id.*) The private prisons had administered 8,095 vaccines. (*Id.*)

By May 21, 2021, ADC had received 43,580 doses from ADHS and had administered a total of 43,587 first and second dose vaccines at its ten state prison complexes. (*Id.*) The private prisons had administered a total of 9,792 vaccines. (*Id.*)

By May 28, 2021, ADC had vaccinated more than 25,000 prisoners, or 70.4% of the prisoner population. (*Id.* ¶ 31.) ADC had received 44,880 doses from ADHS and had

1  administered 44,215 first and second vaccines. (*Id.*) The private prisons had administered
2  10,273 vaccines. (*Id.*)

3        By June 4, 2021, nearly 26,000 prisoners, or 71.3% of the prisoner population, was
4  fully vaccinated. (*Id.*) ADC had received 44,880 doses from ADHS and had administered
5  44,452 first and second vaccines. (*Id.*) The private prisons had administered 10,357
6  vaccines. (*Id.*)

7        By June 11, 2021, more than 26,000 prisoners, or 72.52% of the prisoner population
8  was fully vaccinated. (*Id.*)

9        Plaintiff was fully vaccinated against Covid-19 on June 28, 2021. (*Id.* ¶ 37.)

10       Effective August 24, 2021, an entire comprehensive section dedicated to Covid-19
11 was added to the Medical Services Technical Manual at Chapter 2, Sec. 5.1 as part of ADC
12 Department Order 1102, <u>Communicable Disease and Infection Control</u>. (*Id.* ¶ 35.) The
13 Covid-19 section at ¶ 2.0 provides a comprehensive overview of symptom presentations
14 and defines the procedures the Contract Health Providers ("CHP") shall have in place to
15 comprehensively address the variety of topics related to the management of Covid-19. (*Id.*
16 ¶ 36.) The Covid-19 section at ¶ 3.0 provides procedures for clinical testing of both
17 symptomatic and asymptomatic patients, strategic surveillance testing, and testing after
18 vaccination. (*Id.*) The Covid-19 section at ¶ 4.0 provides procedures for vaccination
19 protocols for both ADC staff and prisoners and procedures related to adverse events
20 resulting from vaccination. (*Id.*)

21       Plaintiff asserts the following facts in his Second Amended Complaint:

> As I have asthma and have been hospitalized in the past over it, compounded with my Hepatitis C . . . I am placed at an extremely elevated risk of death from Covid-19 as it attacks the [respiratory] system as shown in the question[n]aire p[er]formed by medical in their screening of me for Covid-19. Having said underlying health issues decreases my chances of survivability should I be infected. The Director of ADOC, Shinn, has failed in his duties to protect myself and others by their lack of proper cleaning, screening of staff and it is not to be left to happen stance [sic]. This recklessness placed not only myself but the population in total at unnecessary risk of

> infection. The Govern[o]r has determined prisoners are not a vulnerable group.

(Doc. 116-1 at 4.)

### C.   Discussion

Here, the record does not support a claim against Defendant Shinn. First, the facts do not show that Plaintiff suffered a constitutional violation. The available evidence shows that with the onset of the Covid-19 pandemic, ADC implemented masking, testing, and isolation protocols in line with guidance from the CDC and that ADC updated its masking, testing, and isolation policies to remain in compliance with the CDC's evolving guidelines.

Moreover, the record shows that when Covid-19 vaccines became available, ADC promptly began vaccinating staff and prisoners as the vaccines were allocated to the department. Plaintiff was fully vaccinated as of June 28, 2021. These facts do not support a finding of deliberate indifference to Plaintiff's serious medical needs, and Plaintiff does not present any specific evidence that would indicate he received constitutionally deficient medical care. Plaintiff's vague and unsupported statements in the Second Amended Complaint are insufficient to create a genuine issue of material fact that his Eighth Amendment rights were violated.

Additionally, Plaintiff has not presented any facts to refute Defendant's evidence regarding ADC's Covid-19 policies or to show that ADC's Covid-19 policies were deliberately indifferent or medically unacceptable. Because the facts do not show that Plaintiff suffered a constitutional violation or that Defendant Shinn implemented a deliberately indifferent policy, summary judgment will be granted to Defendant Shinn.

. . .

. . .

. . .

. . .

. . .

. . .

      **IT IS ORDERED** that the reference to the Magistrate Judge is withdrawn as to Defendant's Motion for Summary Judgment (Doc. 231), and the Motion is **granted**. The Clerk of Court must terminate the action and enter judgment accordingly.

      Dated this 18th day of March, 2022.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge